(53 South. 890.)

No. 18,031.

MORGAN'S L. & T. R. & S. S. CO. et al. v. RAILROAD COMMISSION OF LOUISIANA.

(Nov. 14, 1910.  Rehearing Denied Jan. 3, 1911.)

*(Syllabus by the Court.)*

1. CARRIERS (§ 189*)—CARRIAGE OF GOODS—REASONABLENESS OF RATES.

The freight rates charged in one state have no bearing upon the rates that ought to be charged in another, unless the conditions are shown to be the same in both states, and it is not satisfactorily shown, in this case, that the conditions under which sugar cane, in bulk, is transported are the same in Louisiana and Texas, though it is shown that the conditions under which sugar beets are hauled, in Wiscon-

sin, and sugar cane, in Louisiana, are very different.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 859; Dec. Dig. § 189.*]

**2. CARRIERS (§ 12*)—RAILROAD COMMISSION—EFFECT OF RULINGS.**

The members of the Railroad Commission are sworn officers, acting without interest or prejudice, and their rulings are accepted by the courts as correct, until shown to be incorrect. But, any party interested has the constitutional right to appeal to the courts upon the question, whether a rate established by the Commission is reasonable and just, and may, by evidence, destroy the prima facie presumption in favor of such rate; otherwise, the appellant could take nothing by his appeal.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 14–20; Dec. Dig. § 12.*]

**3. CARRIERS (§ 12*)—CARRIAGE OF GOODS—REASONABLENESS OF RATES.**

The Railroad Commission is authorized to make rates which are reasonable and just, and no other, but no rate can be reasonable, nor can it be just, as to a railroad company, which is established solely upon the basis of the company's gross revenue, since that is to ignore the fact that gross revenue may be insufficient to meet expenses, and, still more insufficient to yield a return upon invested capital. Moreover, where the company derives its revenue, partly from interstate and partly from intrastate business, a state board is without jurisdiction to predicate a rate upon the revenue derived from the interstate business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 14–20; Dec. Dig. § 12.*]

**4. CARRIERS (§ 12*)—CARRIAGE OF GOODS—RATES—REASONABLENESS.**

A reduced rate upon a particular commodity cannot be said to be reasonable and just when it is established without regard to whether the existing rate is high or low, as compared with rates on other commodities, and without regard to whether it will pay the cost of the service rendered, or yield a fair return to the carrier upon capital invested.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 8, 11; Dec. Dig. § 12.*]

**5. CARRIERS (§ 12*) — CONSTITUTIONAL LAW (§§ 242, 298*)—CARRIAGE OF GOODS—REASONABLENESS OF RATES—"TAKING OF PROPERTY."**

Though it be held by a court of a particular state, and by the Supreme Court of the United States, on writ of error, that a statute of such state, requiring a railroad company to transport a particular commodity, within the limits of the state, for less than cost, is not a taking of property without due process of law, within the meaning of the fourteenth amendment, so long as the company obtains a fair revenue from the whole of its intrastate business, it does not follow that the courts of this state should hold that a rate, in order to be unreasonable and unjust, within the meaning of our state Constitution, must, of necessity, also be obnoxious to the fourteenth amendment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 11; Dec. Dig. § 12;* Constitutional Law, Cent. Dig. §§ 691, 847; Dec. Dig. §§ 242, 298.*

For other definitions, see Words and Phrases, vol. 8, pp. 6851–6862; vol. 8, p. 7813.]

**6. CARRIERS (§ 12*) — CARRIAGE OF GOODS — REASONABLENESS OF RATES.**

When the Railroad Commission establishes general rates, which affect the entire intrastate business of a railroad company, the entire revenue derived from that business is, no doubt, a factor to be considered in determining whether such rates are reasonable and just, or otherwise; but where rates are fixed upon a particular commodity, the only question is whether they produce a revenue, in the first place, sufficient to pay the actual cost of the service rendered, and, in the next place, sufficient to yield a fair return (in the proportion that the business of handling such commodity bears to the whole intrastate business) upon the capital employed.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 19; Dec. Dig. § 12.*]

**7. CARRIERS (§ 12*) — CARRIAGE OF GOODS — REASONABLENESS OF RATES.**

An exception may exist in a case where the carrier handles both the raw and the manufactured material, and the loss on the one haul may be made good by the gain on the other, the whole constituting or considered one and the same business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 19; Dec. Dig. § 12.*]

**8. CARRIERS (§ 12*) — CARRIAGE OF GOODS — REASONABLENESS OF RATES.**

The order of the Railroad Commission, No. 553 of August 6, 1906, establishing freight rates for the hauling of sugar cane, is *held* to be unreasonable and unjust, and hence is annulled.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 19; Dec. Dig. § 12.*]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; E. F. Brunot, Judge.

Action by Morgan's Louisiana & Texas Railroad & Steamship Company and others against the Railroad Commission of Loui-

siana. Judgment for defendant, and plaintiffs appeal. Reversed and rendered.

Denegre & Blair, for appellants. Walter Guion, Atty. Gen. (R. G. Pleasant, of counsel), James Wilkinson, and Foster, Milling, Brian & Saal, for appellee.

### Statement of the Case.

MONROE, J. The three plaintiff corporations are established under the laws, and operate connecting lines of railroad within the sugar producing region of this state, each of them being under the immediate administration of its own officers, but all of them being practically owned by the Southern Pacific Company. They instituted this suit on September 1, 1906, attacking a certain order, "No. 553," which had been made by the defendant (Railroad Commission of Louisiana) on August 6th preceding, and the conditions and circumstances tending to the making of which may be stated as follows:

In 1889, certain persons, impressed, apparently, with the idea that the production of sugar in this state could be made more profitable by segregating the manufacturing from the agricultural branch of the industry, erected at Franklin, in the parish of St. Mary, a factory for the conversion of cane juice into sugar and molasses, with the expectation of obtaining their supply of raw material (sugar cane) from the planters; and, as a necessary part of the scheme, arrangements were made with the railroad company (predecessor of the companies now before the court) for the transportation of the cane from the plantations to the factory, it being agreed, among other things, that the company should furnish to each shipper, for his exclusive use during the grinding season, such flat cars as he might require, and that the shipper should, at his own expense, equip such cars with the temporary racking or crating needed to enable them to carry the freight for which they were intended, and should remove the same at the end of the season. Under the arrangements as thus made (according to plaintiffs), or in spite of them (according to defendant), the new business seems to have thrived, and between 1890 and 1900 quite a number of central factories were established, and the traffic in cane increased from nothing to 187,000 tons, and since 1900 has continued to increase, and now exceeds 200,000 tons per annum. On September 21, 1900, the Commission (defendant herein), over the protest of the railroad company, ordered it (the company) to reduce its rates on cane and to "rack" or bear the expense of "racking" the cars, and the company brought suit to have the order set aside, and obtained judgment decreeing that, as to the racking of the cars, it was unreasonable, because it required different kinds of racking to accommodate the appliances used by different planters in loading, the other points presented not having been passed on. On August 13, 1902, the Commission made another order, to the effect that the carriers should rack the cars at their own expense, and the Morgan Company brought suit on the ground previously relied on to set the order aside. During the pendency of the suit so brought, a compromise was entered into between the companies and certain of the planters and manufacturers, and it was made the order— "No. 305"—of the Commission, bearing date October 2, 1903, which (after reciting the order of August 13, 1902, and that the Morgan Company for itself and for the Iberia & Vermillion Company had brought suit to set it aside, on the ground that it was unreasonable and unconstitutional) reads, in part, as follows:

"Now, therefore, in order to effect an amicable settlement of said controversy and to arrange a method of conducting said sugar cane traffic, which will be fair and just to all par-

ties in interest, it is agreed * * * as follows:

"The carriers agree to pay to each of said producers, on its respective line of railroad, six dollars for each car racked, at the end of each season, to be received by the producer in full settlement and compensation for the racking and unracking said cars and maintaining said racking, such work to be done by the producers in the same general manner as heretofore. All claims, if any exist, growing out of said order of the Commission, for the season 1902–3, are, in consideration of this agreement, waived or abandoned by the producers. [Here follows a number of signatures.]

"It is ordered that the foregoing agreement between the [naming the companies] and the planters and refiners, along the line of railway of said companies, who have signed the said agreement, is hereby approved and authorized."

And then follows a proviso to the effect that planters and refiners who have not signed may take the benefit of the agreement, if they so desire, or may consider themselves entitled to the benefit of the preceding order of August 13, 1902, without prejudice, however, to the rights of the company as asserted in the then pending suit.

On May 16, 1906, a petition (four of the five signers of which appear to have been parties to the compromise thus quoted), reading in part as follows, was presented to the defendant Commission, to wit:

"We, the undersigned, representing the Sugar Planters' Association and the sugar industry of the state of Louisiana generally, do hereby petition your honorable body to establish the following schedule of rates, to apply on sugar cane in the state of Louisiana: [Then follows a schedule of rates.] The above schedule is the same now in force in the state of Texas, and which became effective through the Railroad Commission of the state of Texas on November 20, 1901. There is every reason why the rates should be lower in Louisiana than they are in Texas, and the increase of tonnage transported in Louisiana over Texas certainly justifies as low a rate in this state. * * * We ask that the above rates shall govern, provided the products from the said cane be shipped through the same carrier, and provided, further, that the said carrier shall make as low a rate on the said product as is made by competing carriers. We ask, further, that should the product from the said cane not be shipped through the same carrier, the rates, then, be 100 per cent. higher than the rates ordered by your honorable body on August 23 (13) 1900. * * *"

127 La.—21

And, agreeably to the prayer of the petitioners, and after due hearing, the Commission on August 6, 1906, made its "Order No. 553," which is the subject of the present attack, and which, in part, reads:

"Ordered: That the following rates for the transportation of sugar cane, when shipped to refineries or sugar houses in the state of Louisiana, shall be, and are, established for all railroads operating in this state:

| Distance. | Rate per ton. |
|---|---|
| Under 25 miles | 40 cents |
| Over 25 to 30 miles | 45 " |
| " 30 to 50 " | 55 " |
| " 50 to 100 " | 65 " |
| " 100 to 150 " | 90 " |
| " 150 miles | 1.15 |

"The above rates shall govern, provided the product is shipped out by the carrier delivering the cane; provided that the said carrier establishes as low rates for the transportation of such products as are made by other competing carriers. If the products from the sugar cane are not shipped out by the carrier delivering the cane, then the rates for the transportation of the sugar cane will be 100 per cent. higher than rates named above. The minimum car load weight is hereby fixed at 15 tons. * * *"

The effect of the order so made, if enforced, will be to reduce the existing rate on sugar cane about 10 cents a ton, and (as they carry about 200,000 tons a year) to reduce plaintiffs' receipts from that source about $20,000 a year. Plaintiffs attack the order on the grounds, stated, in substance: (1) That the reduction thereby ordered is not demanded or justified by existing conditions, the established rates being fair and reasonable (save that they are too low) and conducive to the development and profitable conduct of the cane raising and sugar making industries. (2) That, as shown by actual experience, the rates ordered are so low that they will not yield sufficient revenue to pay the cost of moving the cane, and will not permit petitioners to earn from the business any part of the just proportion which it should bear of petitioners' taxes, or fixed charges, or any reasonable return upon their invested capital, but will compel them to con-

duct said business at an actual annual loss, and will be, in effect, a taking of their property without due process of law, and without adequate compensation previously made, and will operate a denial of justice and of the equal protection of the law, all in violation of the Constitution of the United States and of this state. (3) That said rates will effect a discrimination in favor of sugar cane, as compared with all other commodities. Defendant, for answer, alleges that the order complained of is reasonable, legal, and constitutional, and should be maintained, and denies that the order No. 305 of October 2, 1903, has any relevancy to the issues presented.

There were examined, as witnesses on behalf of plaintiffs, Mr. Julius Kruttschnitt, director of maintenance and operation of the Union and Southern Pacific systems, vice president of the Southern Pacific Company, assistant to the president of the Morgan Company, and president of the Iberia & Vermillion Company. His qualifications to give the testimony for which he was called upon are stated by him as follows:

"I have been, for over 28 years, engaged in the construction, management, and operation of railroads in the capacity of resident engineer, general roadmaster, superintendent, general manager, acting chief engineer, vice president in charge of transportation operations, and director of maintenance and operation. My duties require me to analyze and study operating expenses in great detail, to secure efficient operation and to explain their fluctuations to the president and board of directors. In doing this, account is taken of the volume of the traffic transported, as expenses are quickly responsive to the variations in volume. My experience in those matters has extended over 21 to 24 years, during the past 10 of which, I have had direct supervision over the operating expenses of about 9,000 miles, and, during the last three years, of about 15,000 miles, of road. In view of this experience, I consider myself an expert in such matters. My duties required me to study the monthly and yearly expenses of the Union and Southern Pacific Company systems of operation, including the three plaintiff railroad companies, examining each item to determine whether or not it is justified by operating conditions. The extent of my experience may be measured by the annual expenditures for operation of the properties in my charge, which amount to over $100,000,000."

Mr. Thomas O. Edwards, auditor of the plaintiff companies, who has been in the railroad service for 25 years, as telegraph operator, station clerk, station agent, clerk in auditor's office, chief clerk to auditor, traveling auditor, and auditor.

Mr. Charles S. Fay, general freight agent of the three plaintiff companies, who has been in the traffic department of the companies since 1889, and for the past seven years has been the chief officer of those departments.

Mr. William F. Braggins, general agent in Louisiana, of the Texas & Pacific Railway Company, who has been in the employ of that company for over 34 years, and has for 10 years past been in charge of its traffic in this state.

Mr. H. A. Jones, freight traffic manager of the Houston & Texas Central, Galveston, Harrisburg & San Antonio, Texas & New Orleans, and Galveston, Houston & Northern Railway Companies, who has been connected with traffic and rate making departments of railroads in the state of Texas for 25 years, and has occupied his present position since 1900 and 1901.

The witnesses named concur in testifying that the existing rates on sugar cane in Louisiana (and in Texas as well) are very low, and that the reduction ordered by defendant will, if enforced, compel plaintiffs to move that product for a compensation which will not, or will barely, pay the cost, and will contribute nothing towards the payment of plaintiffs' taxes, or the interest upon their outstanding bonds, or capital invested. Mr. Kruttschnitt, who has been from the beginning of the sugar cane traffic in this state familiar with the conditions by which it is affected, testifies with great clearness and precision, and he and Mr. Edwards have furnished a multitude of tabulated statements,

called for by the counsel upon the one side or the other, which are taken either from plaintiffs' books, or from apparently established data, and which cover almost all the facts here at issue or sought to be put at issue.

From the testimony and statements so given and furnished, we find that the first bulk cane was hauled to the Caffrey Refinery, at Franklin, in 1889–1890, or 1890–91, under an agreement, as to rates, which appeared to be satisfactory at the time, and whereby the shipper "racked" the cars; that thereafter the traffic grew steadily from nothing to over 200,000 tons a year in 1906; that in the meanwhile there was no material reduction in the rates, save in so far as the question was affected by the order of the Commission requiring plaintiffs to pay $6 a car for racking; that for the purposes of the business plaintiffs are obliged to provide and maintain an equipment of more than 1,000 flat cars, which during the grinding season (say from October 15th to January 1st) are assigned to the planters respectively, and devoted exclusively to their use, and only about 50 per cent. of which can be utilized by plaintiffs during the balance of the year; that plaintiffs are also obliged to furnish an average of five locomotives, with crews, for the setting of the empty cane cars on the spurs, and their delivery when loaded; that there are (or were in 1906) 84 spur tracks, the aggregate length of which is 15.72 miles, and 89 sugarhouse tracks, the aggregate length of which is 24.59 miles, which tracks were, for the most part, if not entirely, built at the expense of the planters, but are maintained at the expense of the plaintiffs; that the main line of the Morgan road, between New Iberia and Bayou Salé, was found to be inadequate for the handling of both the regular and the sugar cane traffic, and the track was doubled, mainly for the accomodation of the latter; that the order of the Commis-

sion of Oct. 2, 1903, providing for the racking of the cars by the shipper and the payment therefor by plaintiffs of $6 for each of them, was acquiesced in by plaintiffs in a spirit of compromise, and as representing the extreme limit of concession to which they considered it possible for them to go, without subjecting the cane traffic to burdensome loss; that whilst it is impossible to say, with mathematical exactness, how much more it costs to handle local traffic than through traffic in Louisiana, it is a fact that the expense is greater, and a reasonably close estimate can be made of the difference. Mr. Kruttschnitt says upon that subject that the unit of measurement of the commodity, known as transportation, sold by plaintiffs is the ton mile; that is to say, the service rendered in transporting one ton one mile, and that the economy of production depends upon the volume of output, considered with reference to the efficiency with which the machines (freight trains) manufacturing those units are operated.

"I have made," he proceeds, "a careful study of the 28 expense items affected, out of the total 53 above mentioned" (referring to the classification by the Interstate Commerce Commission of operating expenses) "and the difference of cost of running a train in local and in through business was estimated. Their cumulative effect justifies the conclusion that the local freight train mile costs almost exactly twice as much as the through freight train mile. The principal causes justifying this conclusion are, in detail, as follows:

"(1) Branches are built and maintained on which local trains are run for the public whether freight is offered or not. This swells the amount chargeable to the local train service, under the head of maintenance of way and structures. Experience shows that trains are frequently run with but 4 to 10 tons of freight.

"(2) Expensive terminals, as well as way stations, must be maintained to collect, load, and deliver local freights. Through freight requires no way stations and much less expensive terminals. Actual check showed terminal expenses per train mile 2.5 to 3.5 times as great for the line with heavy local business as for the line with trifling amount.

"(3) Less service from locomotives and cars in local service. The daily mileage of a loco-

motive in local service is shown by check to be about half that of one in through service, being as 76 to 160, or as 100 to 213. The difference in car service is much greater, being as 15 to 40, or 100 to 266.

"(4) There is greater consumption of fuel, water, and all other supplies, and greater wear and tear on both locomotives and cars in trains which are frequently started and stopped, broken up and remade. The delays and stops increase the use of fuel and supplies, whilst switching results in increased breakage.

"(5) Greater expense, per mile run, per wages of trainmen and enginemen. The monthly mileages of local and through trains are about as 2,600 to 5,000. Their pay, being apportioned to but half the number of miles, in local service, is doubled per train mile, whilst the disparity in cost is further increased by an additional brakeman on local trains to handle the freight. On branch lines, when the train service is entirely local, the monthly mileage of trains and crews is in many cases only 1,200 or 1,500 miles.

"(6) Large numbers of switching locomotives and crews are required at terminals for the accomodation of local traffic.

"(7) The number of accidents to trainmen is increased through frequent making up and breaking train.

"(8) The haul being short, the greater proportion of the total revenue received for the service is absorbed in the expense of hauling cars to accommodate the traffic, switching, and handling at terminals. On many very short hauls, when the rates are low, the service is unquestionably performed at a loss to the carrier. As a mile run, by local train, costs twice as much as a mile run, by a through train, local ton miles would cost twice as much as through, if both trains were equally as efficient as machines in producing them. This is not the case, however. A comparison, made of through and local trains during the last fiscal year, demonstrated that the average local train in running a mile produced 215 of these units, the through train 448, or twice as much in one case as in the other. Therefore, the relative costs of the local and through ton miles will be as 2 to 1, from difference in train load, or combining both causes the local ton mile will cost four times as much as the through. The business of a railroad is partly through and partly local, and, as the cost of the local proportion of the train mileage is twice the through, its cost as compared with the average cost of all train miles will vary as the relative volumes of local and through business vary. When all train mileage is through, its cost per unit is the same as the average of all, and any local train run will cost as much per mile as the average. When all train mileage is local, its cost per mile is the same as the average of all, and any through train run will cost half as much per mile as the average. If local train mileage is 42 per cent. and through mileage is 58 per cent. of total train mileage, as is the case on these lines in Louisiana, the cost of 100 train miles will be made up of the cost of 58 through miles, and 42 local miles at double cost; equivalent to 84 through miles; in other words, as 100 average miles cost as much as 142 through miles, one through mile will cost $100/142$ or 70.4 per cent. of the average, and all local miles will cost twice as much, or 141 per cent. of the average. For the year ending June 30, 1906, the cost of all kinds of traffic, computed from data taken from the accounts of the various parties to this suit, are as follows:

| Operating expenses. | All freight. | Through freight. | Local freight. |
|---|---|---|---|
| Per train mile | $2.71 | $1.91 | $3.82 |
| Tons of revenue freight in a train | 353 | ·448 | 215 |
| Operating expenses per ton mile | (Mills) 7.88 | 4.26 | 17.77 |
| Earnings per ton | " 11.61 | 8.36 | 21.44 |
| Earnings over operating expenses | 3.93 | 4.10 | 3.67 |
| Ratio of operating expenses to earnings | 66% | 57% | 83% |

"The above data are based on the assumption that passenger and freight traffic must share to the same extent, in operating expenses, as they contribute to gross earnings. In the present case, this proportion is 80 per cent. for freight and 20 per cent. for passenger. Allocating 80 per cent. of operating expenses to freight and 20 per cent. to passenger, and dividing freight expense by freight mileage, we get $2.71 as the cost per average freight train mile. 70.4 per cent. of this, or $1.91 is cost of through train mile, and twice this, or $3.82, is cost of local train mile.

"Statistics for the last fiscal year show the loads for through, local, and all trains to be, respectively, 448, 215, and 353 tons. Dividing cost by tonnage figures gives us the ton mile costs, 4.26, 17.77, and 7.68 mills. Earnings, from statistics kept in the auditor's office are 8.36, 21.44 and 11.61 mills respectively.

"Local ton mile cost of 17.77 mills for operating expenses applies only to either the Louisiana Western Railroad or Morgan's Louisiana & Texas Railroad, taken separately; in fact, operating costs on the Morgan road, where nearly all sugar cane is handled, are somewhat higher. If they were operated independently of each other, the cost would be somewhat greater. All I have said about the greater relative cost of local traffic, etc., is equally true of each individual road. This 17.77 mills, average cost of handling local traffic, does not include anything for taxes, betterments and additions, interest on investment, or the use of equipment.

\* \* \* If I had considered as local, freight beginning and ending on the line of railroad of any one of the plaintiff companies, the result would have been a somewhat greater cost of handling such local freight. \* \* \* The transportation of sugar cane from plantations where produced to the central factories or refineries, where it is manufactured into sugar is, unquestionably, more expensive than the average cost of transporting local freight over the lines of the plaintiffs herein."

The reasons assigned for the conclusion thus stated may be somewhat condensed as follows:

(1) Plaintiffs are obliged, for the special service in question, to furnish more than 1,000 flat cars, and maintain them for 12 months, for the purpose of earning freight with them for two months, and are obliged to pay $6 for the racking of each car.

(2) The haul is short as compared with the average haul of local freight.

(3) The cars are always moved empty in one direction, and the business makes it impossible for plaintiffs to utilize the empty cars for other traffic, so that special cars must be assigned to the cane business, which is not the case with other freight.

(4) The cars thus assigned are kept away from business terminals during the grinding season and suffer from lack of timely attention, whereby the air brakes, safety devices, and running gear generally depreciate more rapidly than they otherwise would, and at the end of the season require more extensive repairs than would be needed if they were currently attended to.

(5) The business requires extra train service, which is afforded by detailing five or six (average of five) locomotives, with their crews, to handle the traffic from the spurs to the mills or to the regular trains, the switch locomotives making very short runs and the trains not being fully loaded, and plaintiffs receiving but one compensation for ten miles of service rendered, whilst the machinery by which those units are manufactured is thus wastefully operated. The daily average cost of trainmen, enginemen, and fuel for this extra service was "last year" $160.

(6) The cane traffic amounts to about 200,000 tons a year, and moves at a period when all other traffic is abnormally heavy and congested. It is therefore moved at far greater expense than if it could be handled at the convenience of the carrier, and when locomotives, equipment, and crews are plentiful, instead of scarce.

(7) The average load of cane is 17 tons (17.6 in 1905–06), but, as the cars move loaded only in one direction, the average load, per train mile, is only 8½ tons, whilst for all revenue traffic on plaintiffs' lines the average load per car, loaded and empty, was 14.05 tons, and the average per loaded car 20.35 tons.

(8) The average earnings of the cane cars was $1.22 per day, whilst the average per diem earnings of all cars in the United States was $2.41; of all other cars on Louisiana lines, $2.88; and of all other cars during the months when the cane cars were engaged, $4.37.

(9) Plaintiffs lose interest on idle capital, and by maintenance and depreciation, on the cost of 175 spurs, aggregating 40 miles of track, for 12 months each year, to enable sugar planters to use them during 60 to 90 days.

"There has been a very large increase" (again quoting the language of the witness) "in the cost of conducting railroad traffic over the lines of the plaintiff companies during the past several years; percentages of expenses to earnings, in the past three years, for example, having increased from 66.53 per cent. in 1904 to 75.92 per cent. in 1905, and to 82.26 per cent. in 1906. Heavy increases in prices paid for labor and material have increased the cost of running a train one mile, on these companies' lines, for all freight, through freight, and local freight, respectively, from $1.76, $1.41, and $2.76 in 1900, to, respectively, $2.71, $1.19, and $3.82, in 1906. Following is a statement showing

certain operating statistics of the Louisiana lines, plaintiffs in the case, from 1899 to 1906, inclusive * * *:

| Louisiana Lines. | 1906 | 1905 | 1904 | 1903 | 1902 | 1901 | 1900 | 1899 |
|---|---|---|---|---|---|---|---|---|
| Oper. Ex. per total train mile | $2.27 | 1.85 | 1.75 | 1.75 | 1.64 | 1.51 | 1.53 | 1.53 |
| Oper. Ex. per freight train mile | 2.71 | 2.05 | 2.01 | 2.02 | 1.83 | 1.69 | 1.71 | 1.63 |
| Tons rev. freight per train | 333 | 264 | 247 | 254 | 283 | 285 | 306 | 289 |
| Oper. ex. per ton-mile | 0.768 | 0.768 | 0.812 | 0.796 | 0.645 | 0.617 | 0.560 | 0.564 |
| Wages per man per day | $2.04 | 2.09 | 2.10 | 2.10 | 1.97 | 1.99 | 1.92 | 1.89 |
| Rel. price commodities | 122.4 | 115.9 | 113.0 | 113.6 | 112.9 | 108.5 | 110.5 | 101.7 |

"Going back seven years, during which time rates on sugar cane, because of cost of racking imposed, have been materially reduced, the operating cost per ton mile on the Louisiana lines in question has increased 36 per cent., notwithstanding an increase in train load by the use of heavier motive power, this increase being due to higher prices paid for railroad materials, materials of all kinds, and higher wage rates, which, in common with all other roads, we have been obliged to pay to secure labor. The average daily wage rate paid all employés in 1906 was $2.04, as compared with $1.89 in 1899. As wages constitute nearly two-thirds of the total operating expenses of a railroad, the effect of this on the cost of transportation, without considering higher prices paid for material, is at once apparent."

And then follows a table showing that, whilst plaintiff handled but 13 per cent. more ton miles in 1906 than 1899, it paid out 54 per cent. more in operating expenses, and 71 per cent. more in wages of employés. For the purposes of his cross-examination, the witness furnished various tabulated statements, which have been duplicated by Mr. Edwards, and which, so far as may be necessary, will be referred to in connection with the testimony of the gentleman last named. Speaking of the flat cars and other special facilities required by the cane traffic, Mr. Kruttschnitt said:

"From the time that such cars are delivered to shippers of cane, each season, to the time when they are returned at the end of each season, there intervenes an average of 87 days. * * *

"The average number of locomotives, used exclusively for cane transportation, for each of the years referred to in this question (1904, 1905, 1906), was five. The number of freight cars, exclusively used, was, in the season ending in 1904, 975; season of 1905, 745; season of 1906, 1075. In addition, there was an average of 5 caboose cars exclusively employed in this service. An engineer, fireman, and engine watchman was employed for each locomotive, also one conductor and three brakemen, to compose a crew for each locomotive (train). * * * About 50 per cent. of the cane traffic was handled in the regular freight trains, the traffic being chargeable with its proportion of such train and engine crews as well as proper proportions of all employés engaged in maintenance and operation of the roads."

He says that the value of the locomotives employed exclusively in the business of handling cane in 1905 and 1906 (the records for 1904 having been lost), and the pay of the employés engaged in that business, were as follows:

| | 1905. | 1906. |
|---|---|---|
| Locomotives (value) | $ 25,000 | $ 30,000 |
| Cars | 314,000 | 444,000 |
| Trainmen | 5,306 80 | 5,518 |
| Engine men | 2,971 88 | 3,443 18 |
| Extra operators | 1,105 00 | 1,105 05 |
| Total | $348,383 68 | $484,066 23 |

"In addition to the above," the witness goes on to say, "fuel stores and repairs of these ex-

tra locomotives cost $8,000 during the season when exclusively engaged in cane traffic; car repairs and racking cost $25,999; ·maintenance of special sugar spurs, $12,000; whilst other expenses are incurred for maintenances of way and for which no separate accounts, in respect to the special cane service, are kept. As only about half of the cane is handled by men and engineers provided for the exclusive use of this traffic, the balance being taken care of by ordinary service on regular freight trains, additional expense is chargeable to the service for its proportion of cost of the latter haulage."

Speaking of rates in Texas, in comparison with those in Louisiana, the witness says:

"The tariff of charges for sugar cane, fixed by the Railroad Commission of Texas, is lower than rates fixed by the Railroad Commission of Louisiana. On the other hand, the rates on sugar and molasses, the products of sugar, are very much higher in the state of Texas, so that the revenues derived by the railroads of the state of Texas for the transportation of cane to the refinery, and the products out, is considerably in excess of the revenue derived by the railroads of Louisiana for the transportation of cane into the refinery, and the products out. Moreover, in Texas the railroads bear no part of the expense of racking or unracking cars."

Being asked, "What other commodity can be carried more cheaply than sugar cane?" the witness replies:

"For the reasons stated, * * * I believe the cost of handling sugar cane is greater than the average cost of handling local traffic. Every commodity handled habitually in heavy car load units, and not involving an empty haul one way, can be hauled cheaper than sugar."

He says that, whilst the cost of transporting a car load of cane, in an ordinary train, cannot be exactly determined, it can be very closely approximated, and he proceeds:

"I have shown that the average load of a car of sugar cane was, in the season of 1906, 17.6 tons; that the average haul of a car load moved is the equivalent of 461 ton miles. Applying this to the operating expenses per ton mile of local freight, * * * 17.77 mills, would produce $8.19 for moving a car load the average distance hauled. The Commission rates for distances between 25 and 35 miles is 45 cents per ton; the revenue on this car of cane would therefore be found by multiplying 17.6 tons by 45 cents or $7.92. It should be borne in mind that the estimated cost of hauling takes no account of increased cost of handling cane over average local tariffs, to which attention has been previously called, or any allowance for taxes, interest on bonds," etc.

Mr. Edwards (plaintiffs' auditor) corroborates and supplements the testimony of Mr. Kruttschnitt, and furnishes a number of statements, prepared from plaintiffs' books, a few of which we shall reproduce, in whole or in part. He says that the Morgan Company has $15,000,000 of stock, of which $5,-000,000 was issued in 1878 in part payment for the property, and $10,000,000 in 1891, on account of money spent on permanent improvements and additions, and that it has outstanding a total of $7,494,000 of bonds, bearing interest at 7, 6, and 5 per cent.; that the Louisiana Western Company has $3,360,000 of stock, issued in the early 80's, for construction, and $2,240,000 of outstanding 6 per cent. bonds issued in 1887, to replace other bonds which had been issued in 1881 for construction; that the Iberia & Vermillion Company has $300,000 of stock issued for construction, and $322,000 of 5 per cent. bonds issued in 1893 for "construction of line." He furnishes certain statements concerning the operations of the three companies for the years ending June 30, 1904, 1905, and 1906, respectively, the totals of which are as follows:

| | 1904. | 1905. | 1906. |
|---|---|---|---|
| Grand total earnings | $6,436,997.34 | $7,601,998.20 | $7,370,734.31 |
| Grand total expenses | 4,282,233.13 | 5,771,250.45 | 6,063,043.78 |
| Percentage of expenses to earnings | 66.53 | 75.92 | 82.26 |
| Int. on funded debt | 640,000.00 | 640,000.00 | 640,000.00 |
| Per cent. of expenses, including interest, to earnings | 76.47 | 84.34 | 90.94 |
| * * * | * * | * * | * * |
| Total Freight Traffic. | | | |
| Tons carried | 2,508,168 | 3,387,902 | 3,962,856 |
| Tons carried 1 mile | 328,551,798 | 420,381,923 | 479,173,744 |

| | | | |
|---|---|---|---|
| Earnings | $4,519,852.03 | $5,592,561.33 | $5,564,078.58 |
| Average rate per ton | 1.81 | 1.65 | 1.40 |
| Average haul (miles) | 131 | 121.1 | 120.9 |
| Aver. rate per ton mile (¢) | 1.38 | 1.33 | 1.16 |

\*   \*   \*   \*   \*   \*   \*   \*   \*

### Sugar Cane Traffic and Earnings.

| | | | |
|---|---|---|---|
| Tons | 120,392 | 197,489 | 208,336 |
| Tons carried one mile | 3,344,493 | 4,331,485 | 5,449,550 |
| Earnings | $63,053.75 | $104,414.60 | $114,520.26 |
| Aver. rate per ton (¢) | .52 | .53 | .55 |
| Average haul (miles) | 27.8 | 21.9 | 26.2 |
| Aver. rate per ton mile (¢) | 1.89 | 2.41 | 2.10 |

Statement showing what plaintiffs actually earned in carrying cane for the years mentioned, at the established rate:

| Season. | Tons. | Revenue. | Average haul. | Rate per ton mile. |
|---|---|---|---|---|
| 1903-4 | 120,392 | $ 63,053.75 | 27.8 miles | 1.89¢ |
| 1904-5 | 197,489 | 104,414.60 | 21.9 | 2.41 |
| 1905-6 | 208,336 | 114,520.26 | 26.2 | 2.10 |
| | 526,217 | $281,988.61 | 24.9 | 2.15 |

Statement showing what would have been earned under the order No. 553 here attacked:

| Season. | Tons. | Revenue. | Average haul. | Rate per ton mile. |
|---|---|---|---|---|
| 1903-4 | 120,392 | $ 54,034.55 | 27.8 miles | 1.62¢ |
| 1904-5 | 197,489 | 87,347.30 | 21.9 | 2.02 |
| 1905-6 | 208,336 | 96,337.56 | 26.2 | 1.77 |
| | 526,217 | 237,719.41 | 24.9 | 1.81 |

Statement showing approximate cost to plaintiff of transporting cane to refineries:

| | 1903-4. | 1904-5. | 1905-6. |
|---|---|---|---|
| Tons carried one mile | 3,344,493 | 4,333,485 | 5,449,550 |
| Estimated cost at 17.77 mills per ton mile | $59,431.54 | $76,970.49 | $96,838.51 |

Statement showing gross earnings and expenses of sugar cane traffic in seasons mentioned and ratio of expense to earnings:

| | 1903-4. | 1904-5. | 1905-6. |
|---|---|---|---|
| Gross earnings | $63,053.75 | $104,414.60 | $114,520.26 |
| Expenses | 59,431.64 | 76,970.49 | 96,838.51 |
| Ratio of expense to earnings | 94.26% | 73.72% | 84.56% |

"In this statement," says the witness, "I have considered only operating expenses, and have not included any expenditures for betterments and additions, taxes, interest on bonded debt, or other returns on capital invested. The pro rata of such expenditures, attributable to cane traffic, is as follows:

| | 1904. | 1905. | 1906. |
|---|---|---|---|
| Taxes | $ 2,066.23 | $ 2,598.00 | $ 3,446.42 |
| Bett'mts & Adds | 3,147.68 | 12,235.40 | 18,766.91 |
| Int. on bonds | 7,586.63 | 10,707.71 | 12,359 91 |
| Total | $12,800.54 | $25,541.11 | $34,573.24 |

"This percentage is determined on the percentage that earnings from the transportation of sugar cane bear to the total gross earnings, on the correct assumption that the cane traffic should share in the expenditures to the same extent as it contributes to the gross earnings," etc.

Statement showing what plaintiffs' earnings would have been from the cane traffic, at the proposed rate, in the seasons as stated:

| | |
|---|---|
| 1906-7 | $ 77,086 09 |
| 1907-8 | 131,889 77 |
| 1908-9 | 112,729 89 |

Statement showing what the traffic for the seasons stated would have cost plaintiff:

| | |
|---|---|
| 1906-7 | $ 68,711 26 |
| 1907-8 | 127,286 74 |
| 1908-9 | 105,541 18 |

In connection with the foregoing statement, the witness repeats what he had said before, that, in his opinion, 17.77 mills per ton per mile, upon which the statement is based, is less than the average cost of transporting cane. He says:

"It is entirely too low, as applied to the seasons herein referred to, because the cost of railroad maintenance and operation has considerably increased during the recent years, owing to the increased cost of labor and material. In Mr. Kruttschnitt's calculation of the cost of this traffic, he assumed that the cost of the sugar cane traffic would be equal to the average cost of all local traffic, whereas I am convinced that the cost of sugar cane traffic is much greater than the average cost of all local traffic when you take into consideration the cost of concentrating cars each year for supplying them to shippers for this traffic—the cost of $6 per car for racking; the cost of extraordinary repairs to the equipment, due to the nature of handling this traffic; and the loss to the company in the earning capacity of the car equipment utilized in this traffic."

He further refers to the fact that the earnings of the "cane cars, between the date of delivery to the refinery and their return to the companies," are only one-third of those of all other cars in service on plaintiffs' lines.

From other statements furnished by Mr. Edwards it appears that the average hauls of sugar cane in 1907 and 1908 were 22.9 and 25.4 miles, respectively, whilst the average hauls of all other freights during the same years were 127 and 125.9 miles, respectively.

Mr. Fay, upon the basis of his general knowledge and experience, testifies that in his opinion the rates fixed by order No. 553 are not fair and reasonable; that the plaintiffs have, to his knowledge, never collected anything under the provision of that order allowing double rates to be charged where the product of the cane is not shipped by the carrier who delivers it. Being asked whether he had compared the rates on cane, taken in connection with the rates on the products of the cane, as established in Texas with the rates which obtain in Louisiana, he replies:

"I have; I have had some statements prepared, under my direction, showing the rate on a ton of sugar cane into a factory in Texas, into a refinery, under the Texas Commission rates, and (have) taken the average product of a ton of sugar cane, in sugar and molasses, out of that refinery, and have compared the same—the total earnings to the railroad—on this cane, sugar, and molasses, with a similar amount, into and out of various refineries in Louisiana (of course, that only applies to our lines) and in each and every case the earnings of the railroad in Texas would have been greater than of the railroad in Louisiana."

Mr. H. A. Jones, freight traffic manager of several Texas railroads, testifies that the sugar cane rates established by the Commission of that state are not fair and reasonable; that he protested against their adoption; and that the railroad companies did not appeal to the courts, for several reasons, the controlling one being that the traffic in sugar cane is comparatively trifling in volume—entirely too small to justify expensive litigation.

Mr. Wm. F. Braggins, general agent in this state of the Texas & Pacific Railway Company, upon the basis of his observation and experience testifies that the rates here complained of are not fair and reasonable, and that the business is undesirable.

There were examined, on behalf of defendant, Mr. Barrow, its secretary; Mr. McLean, secretary of the Texas Commission; Mr. MacFarland, secretary of the State Board of Appraisers; Mr. Erickson, a member of the Wisconsin Railroad Commission; and Messrs. Braud, Burguieres, Chaffe, Chauffe, Godchaux, Howell, Morvant, and Von Trescow, shippers and manufacturers of cane—two of them (Messrs. Burguieres and Godchaux) being signers of the petition which led to the making of the order No. 553. Mr. Barrow proceeds upon a different basis, and arrives at a different conclusion from Mr. Fay in comparing the Texas and Louisiana sugar cane rates. Which of the two bases are correct, we are unable to determine. The testimony of Messrs. McLean and MacFarland is unimportant.

From Mr. Erickson we learn that the Wisconsin Commission ordered the rate on sugar beets to be reduced in that state for the distance here in question from 60 to 50 cents a ton; that the beets are shipped in cars of almost any description—gondolas, box cars, stock cars, or flat cars with the sides boarded up; that the average haul is from 35 to 75 miles (though much nearer the latter figure, apparently); that the average load is 22 tons; and that the cars used in the service earn more money than those otherwise employed.

The other witnesses in the case make no attempt to show that Mr. Kruttschnitt or Mr. Edwards have erred in their statements. Whilst, as a rule, admitting that the business in which they are engaged is profitable, they

decline to answer the interrogatories and cross-interrogatories propounded with a view of ascertaining the extent of the profits. Mr. Charles Godchaux testified that the corporation represented by him, which owns a number of plantations and three factories or refineries, had acquired, with other property, a railroad 27 miles long, which was used during the years preceding the making of order No. 553 for the transportation of sugar cane at the then existing rate, as established by defendant, and that "there were no net earnings."

### Opinion.

In the petition addressed to defendant, asking that the rates established, agreeably to the compromise of 1903, be reduced, the sole reason suggested for granting the request is that the rates established in Texas are lower than those in Louisiana, and that the rates in Louisiana should be as low as those in Texas. There is no hint that the business of raising cane and manufacturing sugar in Louisiana is suffering because of oppressive freight rates, and the petitioners and other parties in interest, appearing as witnesses, have in general admitted that the contrary is the case, and that the business is moderately profitable, and the fact that it is not more so is not attributed to freight rates, but to other causes. Thus, Mr. Godchaux says:

"The cultivation and manufacture of sugar cane has been for the past ten years only moderately profitable. The yield in tons, to the acre, has, as also the price of sugar, decreased since the year 1904, * * * due to unseasonable weather conditions in the fields, and artificial conditions in the sugar market."

What is meant by "moderately profitable" or "reasonably profitable," as stated by Mr. Burguieres, he and the other planters and manufacturers decline to say. They are asked (cross-interrogatory No. 42):

"Give the gross earnings and the net earnings of each of the said factories, apart from any planting operations, for each year, begin-

ning with 1903 and ending with 1906, inclusive. Give the capital stock of each of the said factories, if the same are owned by corporations, and state whether and to what extent said capital stock represents other property than that actually employed in the operation of said factories. If said factories are not owned by corporations, state the actual capital invested therein by the present owners. What is the mortgage or bonded indebtedness of said factories and the rate of interest paid thereon?"

(Cross-interrogatory No. 43):

"State what dividends have been paid by said factory, or factories, or by the companies owning the same, for each year, beginning with 1903, down to and including 1906, giving the rate and total amount paid. State what net profits, if any, have been made by each of said factories during the same period, and what amounts, if any, during said period have been set aside to surplus account or to some other similar account. State what amounts during each of said years were expended by the owners of said factories in the purchase of other factories or sugar plantations. State what amounts, during each of said years, were expended in additions and improvements to the factories with which you are connected?"

Such questions, and many more of like character, were propounded by the learned Attorney General to the plaintiffs, and were answered frankly and exhaustively, but the witnesses for defendant, at whose instance and in whose interest plaintiffs have been ordered to reduce their rates on sugar cane, declined in general (there being, perhaps one exception) to furnish the information which it was the main purpose of the above interrogatories to obtain. Mr. Godchaux, for answer to them says (to No. 42):

"The gross and net earnings of the properties of this corporation are private information, which I at present see no reason for giving out; the same being a private corporation. The Leon Godchaux Company, Limited, owns three factories and twelve plantations, and is capitalized at $1,020,000. The properties of the company are neither mortgaged nor bonded."

(To No. 43):

"I decline to answer, as the information requested pertains to the private records of the company, and is of no interest to others."

Mr. Burguieres answers (42):

"I cannot give the information called for in this cross-interrogatory as such information is

for the exclusive benefit of the stockholders of the company, and can never be made public."

No. 43:

"Same as answer to cross-interrogatory No. 42."

In answer to special cross-interrogatory No. 1, Mr. Burguieres says:

"My associates and I operate four or five factories in this state between the lines of the M. L. & T. R. & S. Co. and its Teche boat lines."

Nor did the petitioners allege that the rate complained of yields to the plaintiffs any undue return upon their invested capital, or is even sufficient to pay the actual expense of the service rendered, and the evidence offered in support of the proposed reduction in rate (the larger proportion of which is, as we think, irrelevant and inadmissible for the purposes of this case) falls short of showing such a condition.

As the case is presented, therefore, we have a number of corporations and individuals, who, partly through the service rendered by plaintiffs, are, for all we know, obtaining a larger revenue than plaintiffs from their investments, and are yet complaining that plaintiffs are charging them too much for such service, because they say it is obtained by other corporations and individuals in Texas at a lower price. In the compromise, incorporated in defendant's order No. 305 of October 2, 1903, and which was signed by four of the five petitioners for the reduction here in question, it is recited that "in order to effect an amicable settlement of said controversy, and to arrange a method of conducting said sugar cane traffic which will be fair and just to all parties, it is agreed," etc., and then follows the agreement and the order (based on the agreement) whereby the rate now complained of was established. Of course, it might have happened that a rate which was fair and just in 1903 should, by reason of changed conditions, have become unfair and unjust in 1906, but if the condi-

tions remained unchanged a party to the compromise, who in 1903 admitted that the rate then established was fair and just, and yet in 1906 asks that it be reduced, may reasonably be expected to give some better explanation of his request than that other people in another state have obtained such reduced rate. In the instant case, the complaint and request for change of rate appears to come from the wrong direction, since the manufacturers and planters, by whom they were preferred, have made no showing, save by references to the weather and to the sugar market, that the conditions under which they do business are any more difficult, or entail any greater expense, in 1906 than in 1903, whereas plaintiffs have shown that since 1903 the cost to them of the service which they render has largely increased.

Recurring to the complaint that the Louisiana rates are higher than the Texas rates, the allegation to that effect is supported by the testimony of defendant's secretary, but he and plaintiffs' general freight agent disagree upon the subject, and, believing them both to be entirely conscientious witnesses, we are unable to determine which is correct. The question is unimportant, however, since the rates charged in one state can affect the question of the rates that ought to be charged in another, only when the conditions are shown to be the same in both states, and that proof has not been satisfactorily made here. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Interstate Commerce Commission v. L. & N. R. R. Co. (C. C.) 73 Fed. 409, 413; Cattle Raisers' Ass'n v. M. L. & T. R. Co., 11 Interst. Com. R., 296, 338.

As to the rates on sugar beets and pulp, it is shown affirmatively that the hauling of those products in Wisconsin is done under conditions so different from those under which sugar cane is hauled in Louisiana that the one has no appreciable bearing upon the other. It appears, moreover, to us that the

Wisconsin carrier gets more for hauling beets and pulp than the Louisiana carrier gets for hauling cane.

The case of Railroad Commission v. Cumberland, etc., Co., 212 U. S. 423, 29 Sup. Ct. 361 (53 L. Ed. 577), is cited on behalf of defendant, to the effect that:

"The rates * * * must be regarded as prima facie fair and valid, or, in other words, the onus was upon the complainant to show that they were, what it asserts, confiscatory and unreasonable."

No one will dispute the correctness of the rule thus stated, and we are of opinion that as the members of the Railroad Commission are sworn officers, acting without interest or prejudice, their rulings are to be accepted as correct until shown to be incorrect. But any party interested has the constitutional right to appeal to the courts upon the question whether a rate established by the Commission is just and reasonable or otherwise, and may, by evidence, destroy the prima facie presumption in its favor; otherwise he could take nothing by his appeal. In one of the briefs filed on behalf of defendant (first supplemental), certain figures are cited from the transcript as showing that plaintiffs will lose but $18,500 a year by the reduction ordered; that their gross earnings for three years were $9,765,331.12, and for one year $3,255,-110.37, or an average gross earning per mile of road of $5,823.10, and the brief proceeds:

"It will thus be seen that, when the above amount of $18,500 is divided by the entire mileage of the three railroads operated by plaintiffs, the reduction in gross revenue to plaintiffs will amount to less than $33.10 per mile, and that this amount, when deducted from the average gross earnings per mile of plaintiffs' railroads, as above given, would still leave them a gross revenue per mile, should the order of the Commission be maintained of $5,790. Again: When the subject is considered from the standpoint of the insignificance of the sugar cane traffic as compared with other local traffic of plaintiffs, both as to tonnage and revenue, it will be apparent that the reduction ought not to be regarded as a factor to be considered, but that after all the question to be answered is whether this reduction will so reduce the revenues of plaintiffs as to make the order of defendant Commission so unjust and unfair as to be set aside as unreasonable."

The proposition thus stated, as we understand it, means that, so long as plaintiffs are in receipt of a "gross revenue," such revenue may be reduced by reducing the rate on any commodity carried by them for the benefit of any shipper who may request the reduction, without regard to its sufficiency or insufficiency to maintain and operate plaintiffs' roads, or to yield a fair return upon their invested capital, and without regard to the question whether the shipper has any just cause to complain of the rate already established on such commodity. The Constitution of this state, however (article 284), confers on the "Commission" (created by the preceding article) power and authority "to adopt * * * reasonable and just rates. * * *" And, it further provides that (article 285):

"If any railroad * * * company, or other party in interest, be dissatisfied with the decision or fixing of any rate, * * * such party may file a petition, setting forth the cause * * * of objection, * * * in a court of competent jurisdiction, * * * and either party * * * may appeal the case to the Supreme Court of the state, without regard to the amount involved, and all such cases shall be tried summarily, and by preference over all other cases."

It will be observed that the power conferred on the Commission is to make "reasonable and just" rates, and that the grant of power so made to the Commission is followed by another grant, which, in effect, confers upon the courts the power to see that the rates made by the Commission are such as it is authorized to make, to wit, reasonable and just rates; that is to say, rates which are reasonable and just as to one of the parties affected as well as the other. But no rate can be reasonable or can be just as to a railroad company which is established solely on the basis of its gross revenue, since that would be to ignore the fact that its gross revenue may be insufficient to

meet its expenses, by reason of which condition many corporations go into the hands of receivers, and many individuals into bankruptcy. Moreover, in the case before us, a large part of plaintiffs' gross revenue is derived from their interstate business, and a State Railroad Commission is without authority, under any circumstances, to predicate an order establishing a rate upon the revenue so derived. In Smyth v. Ames, 169 U. S. 541, 18 Sup. Ct. 432 (42 L. Ed. 819), a case relied on by defendant, Mr. Justice Harlan, as the organ of the court, said:

"If we do not misapprehend counsel, their argument leads to the conclusion that the state of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation in respect to its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property, wholly within its limits, must be determined without reference to the interstate business done by the carrier or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which so far as rates are concerned the state has no control."

The proposition relied on appears to us to be unsound, however, for the purposes of this case, even if it be confined in its application to the gross revenue derived by plaintiffs from business done wholly within the limits of this state, and even if it should be conceded that such revenue is sufficient to pay the expenses of that business and to yield a fair return upon the capital invested therein, since it leads to the conclusion that the Commission may, at will, select a particular commodity and reduce the rate upon it, whether the existing rate be low or high as compared with the rates on other commodities, and whether it yield a fair return to the carrier or otherwise.

The Attorney General refers us (in his second supplemental brief) to the case of North-

ern Pacific R. Co. v. State of North Dakota, 216 U. S. 579, 30 Sup. Ct. 423, 54 L. Ed. 624, as supporting his contention that "the order of defendant, reducing the rates for sugar cane transportation, should be maintained, even if it be believed that the revenue derived by plaintiffs from such transportation is only sufficient, or even insufficient, to meet that expense."

The case cited is stated by Mr. Justice Holmes as follows:

"This is a proceeding by the Attorney General of North Dakota, charging the plaintiff in error with continuous violation of a law fixing rates for the carriage of coal within the state, and asking for an injunction. * * * The railroad answered that the act was void under article 1, § 8, of the Constitution—the commerce clause—and also under the fourteenth amendment, because the maximum rates fixed by it were inadequate and confiscatory. Evidence was taken and reported to the Supreme Court, and that court decided that the injunction should issue, as prayed. * * * The grounds of its decision were that the act referred only to transportation wholly within the state, and therefore was not bad, under article 1, § 8, thus removing that question; and that the evidence did not prove that the rates would entail a loss on the carriage of coal, so that it was not necessary to decide whether, in that event, it would be unconstitutional if the railroad made a fair profit on its whole business within the state. The court did, however, intimate in its opinion that, if the railroad was able to make a fair profit upon its whole business within the state, it might be required to carry a particular commodity at cost, or possibly below, and it expressed its opinion so strongly that the counsel for the plaintiff in error treats that doctrine as the ground of the decision, and the statement as to the insufficiency of the evidence, as made only in the light of it and upon rather technical grounds."

The conclusion of the learned justice was that it was not sufficiently proved that the rate fixed by the statute was less than the cost of carrying of the coal, and hence that the constitutional question, under the fourteenth amendment, was not presented for decision.

It was thought, however, that the required proof might be made if another opportunity were afforded the railroad company, and therefore, in affirming the decree of the state

court, the company's right to reopen the case for that purpose was reserved.

The ruling thus made is inapplicable to the case at bar. Under the fourteenth amendment, the Supreme Court of the United States has to do with state statutes which deprive "any person of life, liberty or property without due process of law," or "deny to any person * * * the equal protection of the law," and whilst it may hold that such a statute, requiring a railroad company operating within the limits of a state to transport a particular commodity for less than cost, so long as it obtains a fair revenue from its whole business, is not obnoxious to that amendment, it by no means follows that a court of this state, called on to apply the provisions of our Constitution, should hold that a freight rate, in order to be "unreasonable and unjust," must, of necessity also, deprive the party interested of his or its property without due process of law, etc. The corporations now before this court, as plaintiffs, were created under the law of this state, and save where restrained by the Constitution of the United States, or of this state, the General Assembly may do with them as it will. The same Constitution, however, which established the General Assembly, created the Railroad Commission, and it confers on the latter body the power to make freight rates—rates that shall be reasonable and just, and no other kind. When, in the exercise of the power thus conferred upon it, the Commission establishes general rates which affect plaintiffs' entire intrastate business, their (plaintiffs') entire revenue from that business is no doubt a factor to be considered in determining whether such rates are reasonable and just. But, where rates are fixed upon a particular commodity, the question, and the only question, as it appears to us, is whether they produce a revenue, in the first place, sufficient to pay the actual cost of the service rendered, and, in the next place, sufficient to yield a fair return (in the proportion that the business of handling such commodity bears to the whole intrastate business) upon the capital employed. An exception to the rule so stated may be presented (and possibly there may be others, which, however, do not now occur to us) where the carrier has the handling of both the raw material and the output, and a loss on the one haul may be made up by a gain on the other; the whole constituting one and the same business.

The Supreme Court of Texas, dealing with statutory provisions similar to those contained in our Constitution, has held (quoting from the syllabus of the case):

"4. Under Rev. St. 1895, arts. 4565, 4566, providing that, if any railroad company is dissatisfied with any rule or regulation adopted by the Railroad Commission, it may file a petition in court, stating its objections, on the trial of which the burden shall be on the plaintiff to show that the rule or regulation is unjust and unreasonable. The court in which such petition is filed has jurisdiction to determine whether the regulation is unjust.

"5. In the determination of such question, the terms 'unreasonable' and 'unjust' are not to be restricted to mean that the regulation complained of is a taking of property without proper compensation or without due process of law." Railroad Commission v. Houston & T. C. R. Co., 90 Tex. 340, 38 S. W. 750.

In another case, by the same court, it was said:

"If articles 4565 and 4566 had not been enacted by the Legislature, the courts would have no authority to revise rates made by the Railroad Commission, but, in the exercise of their equity powers, the courts could enjoin such rates, if found to be confiscatory; that is, violative of the Constitution of the United States or of this state."

And it was held that a rate on lumber which did not yield sufficient revenue to pay the cost of transportation was unreasonable. Concluding, however, the court intimated that a carrier might be required to transport unimportant articles for less than cost. Gulf, C. & S. F. R. Co. v. Railroad Commission, 102 Tex. 338, 116 S. W. 795.

In still another case from the same court (relied on by both sides), it was held:

"Under Rev. St. 1895, arts. 4565, 4566, authorizing proceedings in court to determine whether rates fixed by the Commission are unreasonable or unjust, a rate which barely returns the actual cost of the service, without affording any profit on the investment, is unjust and unreasonable." Texas & N. O. R. Co. v. Sabine Tram Co. (Tex. Civ. App.) 121 S. W. 256.

The doctrine that a state law, or regulations made thereunder, establishing rates for transportation by railroads that will deprive the carrier of just compensation is repugnant to the fourteenth amendment, as depriving the carrier of his property without due process of law, and denying it the equal protection of the law, is, categorically, enunciated in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, supra, and is supported by previous decisions in the following, among other, cases, to wit: Granger Cases, 94 U. S. 113, 155, 165, 179, 180, 181, 24 L. Ed. 77, 94, 97, 99, 102; Railroad Commission Cases, 116 U. S. 307, 331, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Dow v. Beidelman, 125 U. S. 689, 8 Sup. Ct. 1028, 31 L. Ed. 841; Georgia R. & B. Co. v. Smith, 128 U. S. 174, 179, 9 Sup. Ct. 47, 32 L. Ed. 377; Chicago, M. & St. P. R. Co. v. Minnesota, 134 U. S. 418, 458, 10 Sup. Ct. 462, 702, 33 L. Ed. 970; Chicago & G. T. R. Co. v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Covington & L. T. R. Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560.

In Chicago & N. W. R. Co. v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744, Mr. Justice Brewer, sitting in the Circuit Court, held (quoting from the syllabus) that:

"Equity will restrain the enforcement of a schedule of rates for railroad charges, fixed by legislative authority, when the rate prescribed will not pay the cost of necessary skilled service, the cost of the best appliances, and the keeping of the same in proper condition, interest on bonds, and then leave something for dividends."

We think it is fairly apparent from the statement which precedes this opinion that the rates here attacked do not meet the requirements of the law, in that they are uncalled for, unreasonable, and unjust, for as much as the revenue to be produced by them would be barely sufficient, if sufficient at all, to pay the actual cost of moving the commodity to which they apply, and would leave nothing, or next to nothing, wherewith to compensate plaintiffs for the use of their property, or for the payment of their debts, or for betterments, or dividends; nor do we find that the lack of revenue from the rates on the raw material would be made up by those on the products. It is true that the amount of revenue derived by plaintiffs from transporting the products of the cane handled is not definitely fixed, but Mr. Edwards says, in his testimony:

"Attention is called to the fact that the product of the cane handled by plaintiffs, during the three years named, bears but a small proportion to the total of such commodity handled, being less than 8 per cent."

And we concur in the view, expressed by the Supreme Court of the United States, that, because mathematical exactness cannot be obtained in a matter of this kind, it is not a sufficient reason for disregarding the evidence. Chicago & R. Co. v. Thompkins, 176 U. S. 178, 20 Sup. Ct. 336, 44 L. Ed. 417.

Lest it should be supposed that they have been overlooked, we note the following points, suggested by counsel for defendant, to which we have not heretofore referred:

It is said that the prayer of the petition is that the order of the Commission be decreed "unjust, unreasonable, null, void, and of no effect," but that there is no prayer that it be set aside on that account. We apprehend that if plaintiffs get what they pray

for they will not need any further relief as against defendant's order No. 553.

It is said that all testimony in regard to the expense of racking the cars, to which plaintiffs have been and are subjected, was irrelevant, and should have been excluded, as they were bound to furnish cars suitable for the business. We are of opinion that plaintiffs are entitled to show what it costs them to move the cane; and, as one of the items of expense was the use of their cars, it is immaterial whether the $6 per car, paid annually for racking, be added to the value of the cars or considered separately.

It is said that Mr. Kruttschnitt is in error in attributing the development of the central factory business to the low freight rates granted by the railroads. Perhaps so; but it is quite certain that the business would not have developed if there had been no roads upon which the cane could have been carried, and as the parties interested admit the development, though they refuse to disclose the extent of their prosperity, the error, if error there be, is harmless.

It is said that Mr. Kruttschnitt gives a poor reason for his opinion that the order complained of should be set aside when he says that plaintiffs have 84 spur tracks, "put in for the sole and only purpose of loading bulk cane," since the spur tracks were paid for by the planters and manufacturers. It is true that they were so paid for, though put in by plaintiffs, but the burden of maintaining the tracks during the 12 months of the year, in order that they may be used during the grinding season, is borne by plaintiffs.

It is said that plaintiffs' assertion that the flat cars earned only $1.22 per day, whilst the average earnings of all other cars in Louisiana for the year was $2.88 per day, and for the grinding season $4.37, is without merit in this controversy. We are inclined to think that the criticism is sound, as it does not seem to us that the per diem value of the cheapest car in plaintiffs' service can be ascertained by averaging it with those that are more valuable.

The further criticism, however, to the effect that, in reckoning the cost of the business to plaintiffs, only the days during which the cars are actually at work should be counted does not appear to be so well made. Plaintiffs furnish the cars (worth in the aggregate, say, $400,000) when they are called for, and take them back when they are returned. They are deprived of their use during the entire interval, at the request of the planters and manufacturers, and the latter ought to compensate the entire deprivation.

We are of opinion that the testimony of Mr. Kruttschnitt, which has been reproduced in our statement of the case, sufficiently answers the objection that he has not shown, with mathematical exactness, the difference, and the reason for the difference, between the cost of carrying through and local freight, and between the cost of carrying cane in bulk during the grinding season and other local freight. His conclusions appear to have been based upon his own extensive experience and upon statistics compiled from the experience of others, a basis upon which the larger proportion of the most conservative business in the world is conducted, and the only possible basis upon which the desired information could have been furnished.

It is said that, if plaintiffs did not get the entire output of the factories to which they delivered cane, they might have recouped themselves by charging 100 per cent. for such delivery. Mr. Fay testified, however (and no one contradicts him), that the 100 per cent. provision, in order No. 553, has been regarded and treated as a dead letter, and that, unless by mistake, no such rate has ever been collected. Considerable space in the briefs of counsel is devoted to showing plaintiffs' prosperity, and, whilst we may not be able altogether to follow the process by which it is reached, we agree with the

general conclusion that they are quite prosperous, as are also, we imagine, the planters and manufacturers who have testified for defendant.

Attention is called to the fact that of defendant's witnesses Mr. Godchaux testifies that the transportation of cane costs 20 per cent. of its value; Mr. Burguieres, 16 per cent.; Mr. Von Trescow, 14 per cent.; Mr. Chaffe, 88¼ per cent. We do not see how the testimony, even if we knew which of it to accept, affects the case.

For the reasons thus given, we are of opinion that the order here complained of is unreasonable and unjust, and should be annulled.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed and that there now be judgment in favor of the plaintiffs herein, and against the defendant, the Railroad Commission of Louisiana, decreeing null, void, and of no effect its order, No. 553 of date, August 6, 1906, establishing freight rates in sugar cane in this state. It is further ordered that defendant pay all costs.

BREAUX, C. J., concurs.