118 So.2d 372

**SOUTHERN BELL TELEPHONE AND
TELEGRAPH COMPANY**

v.

**LOUISIANA PUBLIC SERVICE
COMMISSION et al.**

No. 44639.

Jan. 11, 1960.

Rehearing Denied March 21, 1960.

———◇———

Harvey Peltier, J. Raburn Monroe, Andrew P. Carter, James C. Henriques, Jr., Drury B. Thompson, New Orleans, for plaintiff-appellant.

Theo F. Cangelosi, Baton Rouge, Louis Fenner Claiborne, New Orleans, for defendants-appellees.

Thomas S. Adair, Atlanta, Ga., amicus curiae.

VIOSCA, Justice.

This case is a sequel to our decision in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431, 437. In that case Southern Bell Telephone & Telegraph Company, hereinafter referred to as "Southern Bell' or the "Company" instituted suit to annul an order of the Louisi-

ana Public Service Commission, hereinafter referred to as the "Commission", which reduced its intrastate rates. In refusing to annul the Commission's order, we pointed out that the Commission in its order stated:

> " 'If at any time in the future, the company's investors are prejudiced in their enjoyment of a fair and equitable return, this Commission will be available for appropriate rate adjustments.' "

In commenting on this order we said:

> "As appears from its Order, the Commission has retained jurisdiction to act upon any revision of the amount of the reduction which can be based upon competent evidence. Thus, the door is not closed to the Telephone Company in the proceedings in which the order herein involved was rendered."

Availing itself of this suggestion, Southern Bell, on August 14, 1957, filed an application with the Commission for an increase in its intrastate rates and charges, basing its application upon: (1) the low and inadequate earnings under the prevailing telephone rates, (2) the urgent need to expand and improve its plant facilities in order to meet the Louisiana public's continuing heavy demand for more and more service, and (3) the greatly increased cost of capital.

The application sought an immediate increase of $7,000,000 a year on an emergency basis and asked that the Commission schedule an early hearing, and that at the conclusion of such an investigation it fix just and reasonable rates for the Company's Louisiana intrastate service which will provide the Company with a fair rate of return.

The Commission referred the Company's request for an immediate emergency increase to the merits and held long and extensive hearings which resulted in a voluminous record. On October 10, 1958 the Commission handed down its order in which it denied the Company's application. In a thorough and comprehensive opinion [1] the Commission concluded that Southern Bell was entitled to increased earnings in the sum of $1,918,707 but it ordered this relief withheld on the ground that: " * * * at least since April, 1957, the Company has rendered grossly inadequate service to its Louisiana subscribers and has arbitrarily curtailed a necessary expansion program in this state, thereby failing to perform its obligation as a public utility to such an extent as to require the commission to deny to the company the increase to which it would otherwise be entitled."

On appeal to the Nineteenth Judicial District Court in and for the Parish of East Baton Rouge, where the Commission is domiciled, that court reversed the Commission insofar as it withheld the increase of $1,918,707 on the ground that the issue of the Company's failure to perform its obligations as a public utility was not before the Commission. The district court otherwise affirmed the order of the Commission. No appeal was taken from the district court's ruling with respect to the item of $1,918,707 but, Southern Bell appealed from the district court's decision insofar as it denied the Company's application for the additional increase. Hence the matter is now before us on review from the rulings of the Commission and the district court insofar as they denied an increase in rates so as to yield a sum in excess of $1,918,707.

The specific amount of increase asked by the Company in its petition to the district court is $14,242,478 per annum. In that petition the Company says that an allowance of less than $7,848,351 would be confiscatory, that it should receive a net return of a minimum of 6% on its net investment in Louisiana, and that a reasonable and just allowance would be 7½%. It argues that it has earned a net return of only 4.07% for the year 1957 on the rate base which it contends should be adopted and that even with the exclusion of the items of telephone plant under construction, materials· and supplies, and cash require-

1. 26 P.U.R.3d 55, 114.

ments, which the Commission disallowed, it earned a net return for 1957 of only 4.21%.

In the specification of errors in its petition in the district court, Southern Bell makes 27 complaints. In its brief filed in this Court the Company says:

"In the interest of brevity, we will not here list all of these specifications but simply the two errors which the particularization in the Transcript details. These errors are:

"1. The order of the Commission deprives the Company of its property without due process of law—Article 1, Section 2, Louisiana Constitution (1921) [LSA].

"2. The rates fixed by the Commission are not just and reasonable as required by Article 6, Section 4 of the Louisiana Constitution (1921)."

As some of the 27 alleged errors complained of are duplications and others are conclusions of law, and as in two instances the alleged errors have been rectified either by the Commission or by the district court, we shall not discuss these complaints in the way in which they are set up in the specification of errors but shall cover them all in this opinion.

There is practically no dispute in the facts in this case. The test period used was the entire year 1957.[2] The amount of net average investment in intrastate property in Louisiana as taken by the Commission from the Company's books was $191,780,-407. This amount is made up as follows:

The correctness of these figures is conceded by the Company. The Commission

|  | Average |
|---|---|
| Telephone Plant in Service | $224,027,862 |
| Telephone Plant under Construction | 4,783,150 |
| Property Held for Future Telephone Use | 204,794 |
| Materials and Supplies | 1,298,476 |
| Cash Requirements | 541,856 |
| Total Gross Investment | $230,856,138 |
| Depreciation Reserve | 39,075,731 |
| Net Investment | $191,780,407 |

---

2. At the beginning of the hearing the test period was the first six months of 1957. As the hearing proceeded and extended into the year 1958, the entire year 1957 was used as the test period.

however concluded that the net investment for the purposes of this case should be $185,156,925.00, arriving at this figure as follows:

|  | Average |
|---|---|
| Net Investment (supra) | $191,780,407 |
| Eliminations: | |
| Telephone Plant Under Construction | 4,783,150 |
| Materials and Supplies | 1,298,476 |
| Cash Requirements | 541,856 |
| | $ 6,623,482 |
| Net Investment | $185,156,925 |

From the above it will be seen that the Commission contends that the items of telephone plant under construction, material and supplies, and cash requirements should be eliminated in arriving at the net investment. The Company disputes the right of the Commission to deduct these items.

There is no dispute with respect to the operating revenues or expenses of the Company with the exception of an item of expense for advertising in the sum of $225,000 which the Commission disallowed and an item of $770,633 for income taxes actually paid but which the Commission deducted in its hypothetical computation of capital structure under the prudent investment formula which it adopted.

A major dispute between the parties is with respect to the capital structure. The Company contends that the rate of return should be based on its net investment in Louisiana, that is original cost of its property, less depreciation, while the Commission has adopted and applied a formula under the prudent investment theory under which it set up a hypothetical capital structure based on a ratio of 45% debt capital and 55% equity capital (in this case common stock). Alternatively the Company contends that the allowance of 4% for debt capital is too low and that the rate of return fixed by the Commission on the equity capital should be applied to all of the common stock which on December 31, 1957 constituted 74.6% and not 55% of the capital structure.

The Company further vigorously protests against the application of the earnings-price ratio adopted by the Commission to the common stock of the Company based on par value and excluding surplus.

A last major complaint of the Company is that the rate of return adopted by the Commission is discriminatory and not just and reasonable. Before taking up these disputed points, it is necessary that we determine the extent of our jurisdiction in this case.

■ The Commission urges that since rate-making is a legislative function and not a judicial function we should confine our inquiry to a determination of whether the rates are confiscatory, and that it is not the function of this Court to determine for itself what is a just and reasonable rate. Undoubtedly this is the general rule in other jurisdictions. In this state however this Court is given the final authority and duty to determine by full review whether or not the action of the Commission in fixing rates conforms to the Constitutional requirement that the rates should be just and reasonable. Article VI, Section 5 of the Constitution of 1921 provides:

"The orders of the Commission fixing or establishing any rate, fare, toll or charge for any commodity furnished, service rendered, or to be rendered, by any common carrier or public utility named herein, or hereafter placed under the control of said Commission, shall go into effect at such time as may be fixed by the Commission, and shall remain in effect and be complied with, unless and until set aside by the Commission, or by a final judgment of a court of competent jurisdiction, in a suit setting aside and annulling the same; provided, however, that if an interlocutory injunction is applied for, and if of opinion that irreparable loss or damage would result to plaintiff unless a temporary restraining order is

granted, the judge of the district court having jurisdiction may grant a temporary restraining order, to remain in force only until the hearing and determination of the application for an interlocutory injunction; provided, that no injunction shall issue until after five days notice has been given the Commission.

"The orders of the Commission shall be enforced by the imposition of penalties as hereinafter provided, and any party in interest may appeal from orders and decrees of the Commission to the courts by filing suit, within ninety days from the date of the Commission's order, and not thereafter, against the Commission at its domicile. All cases contesting orders of the Commission, both in the trial and appellate courts, shall be tried summarily and by preference over all cases, and may be tried either in chambers, or at term time. Appeals from decisions of the trial court shall be direct to the Supreme Court, and shall be returned within ten days after the granting of the appeal. When the Commission appeals no bond shall be required."

It will thus be seen that appeals may be taken from the Commission's orders to the district court and then to this Court.

Article VII, Section 10 of the Constitution of 1921 provides:

"In all civil and probate cases where the Supreme Court is given appellate jurisdiction, the appeal shall be both upon the law and the facts."

It has been repeatedly held that in Louisiana appellate review in civil cases extends to matters of both law and fact.[3] LSA–R.S. 45:1191 to 1194 specifically set forth the procedure for review of rulings of the Commission. LSA–R.S. 45:1192 provides:

"If any of the persons, mentioned in R.S. 45:1191, or other party in interest, shall be dissatisfied with any order entered by the commission, adopting, fixing, changing, altering, or modifying, any rate, classification, rule, charge, or general regulation, the dissatisfied person may, within three months after the order made by the commission becomes effective, file in a court at the domicile of the commission, a petition setting forth the particular cause of objection to the order or regulation of the commission complained of. All such cases shall be tried in the same manner as civil cases and shall be given precedence over all other civil cases in the court, and shall be heard and determined as speedily as possible. The court may affirm the order of the commission complained of, or it may change, modify, alter, or set it aside, as justice may require."

In Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, 132 La. 193, 199, 61 So. 199, 201 in dealing with a provision in the 1898 Constitution, similar in scope to Article VI, Section 5 of the Constitution of 1921, we said:

"Article 285 of the Constitution of 1898 provides for the review at the instance of any party in interest of any decision, order, rule, act, or regulation of the Railroad Commission by suit in a court of competent jurisdiction at the domicile of the Commission, and gives either party to the action the right to appeal the case to the Supreme Court of the state, without regard to the amount involved. Appeals in all civil cases are 'on the law and the facts.' Const.1898, Art. 285. Hence it is not only the right, but the duty, of this court to determine whether the order complained of was justified by the facts of the case. This court is bound to interfere when it finds that the judgment appealed from is clearly wrong on the evidence. This court in several cases has reversed orders of

3. In Lumbermen's Mutual Casualty Co. v. Elbert, 348 U.S. 48, 53, 75 S.Ct. 151, 155, 99 L.Ed. 59, the Supreme Court of the United States in a footnote stated: " * * * In Louisiana, appellate review in civil cases extends to both matters of law and fact." Other cases in Louisiana so holding are: Lorance v. Smith, 173 La. 883, 138 So. 871; White v. White, 161 La. 718, 109 So. 399; Esteve v. Continental Southern Lines, Inc., La.App., 83 So.2d 404.

the Railroad Commission as not justified by the facts of the case. See Texas & P. Ry. Co. v. Railroad Commission, 127 La. 387, 53 So. 660; Morgan's L. & T. R. & S. S. Co. v. Railroad Commission, 127 La. 636, 53 So. 890; Yazoo & M. V. R. Co. v. Railroad Commission, 130 La. 1012, 58 So. 862."

In the comparatively recent case of Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250, after considering the facts we annulled and set aside the order of the Louisiana Public Service Commission and authorized the utility to increase its rates and charges.[4]

▉ While we thus have the power and it is undoubtedly our duty to set aside the rulings of the Commission where we believe them to be clearly wrong on the facts and/or the law, we nevertheless should accord great weight to the rulings of the Commission and should not overturn them in the absence of a clear showing of error. Courts should act slowly in substituting their own views and discretion for those of a body peculiarly constituted to act intelligently in such cases and primarily charged with doing so.

4. See also Texas & New Orleans R. Co. v. Louisiana Public Service Commission, 235 La. 973, 106 So.2d 438 and Missouri Pacific R. Co. v. Louisiana Public Service Commission, 238 La. 243, 115 So.2d 337 where we reversed and vacated orders of the Louisiana Public Service Commission.

Bearing in mind these principles we shall now consider the controversial questions.

Telephone Plant Under Construction.

In disallowing this item the Commission held:

"In the instant proceeding, we believe that the inclusion of Telephone Plant under Construction, in the amount of $4,783,-150, in the determination of a property rate base would be contrary to sound rate-making principles. The Uniform System for Accounts for Class A and Class B telephone companies, as prescribed by the Federal Communications Commission in § 31.-100:2 provides:

" 'This account shall include the original cost of construction of telephone plant, other than station apparatus, that is not completed ready for service. It shall include interest during construction, taxes during construction, and all other elements of cost of such construction work.'

"This means that, when the construction work is completed and the new plant goes into service, its total cost, including interest (at 5 per cent for Southern Bell), taxes, and other overheads, is capitalized. It is manifest that the Company can suffer no injustice by the exclusion of such construction from the rate base. Moreover, a sub-

stantial portion of the plant under construction is designed for new customers and for the upgrading of present telephone subscribers. If, therefore, plant under construction were to be included in the rate base upon which a fair return is computed, equity would require the inclusion also of the estimated additional revenue produced by such construction. Otherwise, the existing telephone users would be forced to pay a return on property constructed for future subscribers, with the result that when these future customers begin to receive service the company would derive a double return on the cost of such construction. Southern Bell has offered no evidence of its anticipated revenue from this construction. In Arkansas Power & Light Co. v. Arkansas Pub. Service Commission, 1956, 226 Ark. 225, 289 S.W.2d 668, 14 P.U.R.3d 38, the Arkansas Supreme Court said:

" 'In a well considered and reasoned case—from which we shall quote somewhat at length—where the situation was similar, in effect, to that on which our commission acted here, the supreme court of Vermont in Re Central Vermont Pub. Service Corp., 1950, 116 Vt. 206, 71 A.2d 576, 581, 83 P.U.R., N.S., 47, 52, with reference to the duty and powers of a public service commission of that state to follow any certain formula in fixing rates, announced certain rules and principles of law applicable here. It was there said: "In the employment of its test-year basis, the commission made no adjustment for the revenues which would be produced from the plant under construction when completed. Once it had been decided to eliminate plant under construction from the rate base (as here) the exclusion of revenues to be received therefrom automatically followed. Only so could it be determined whether the petitioner's earnings were adequate to provide a fair return on the property producing those earnings. Both property under construction and the estimated revenues therefrom must be included in the rate base, or neither." Here the commission included neither, which was proper.' " [5]

We agree with the Commission's ruling that the item of telephone plant under construction should be excluded from the net investment.[6]

## Materials and Supplies and Cash Requirements.

In disallowing these items the Commission held:

5. For other cases cited by the Commission in support of its ruling see 26 P.U.R.3d at page 79. See also Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, Miss., 113 So. 2d 622 and the cases cited therein.

6. A similar ruling was made by the Mississippi Supreme Court in the case of Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, supra.

"We do not think that Materials and Supplies ($1,298,476) or Cash Requirements ($541,856), both aggregating $1,840,332, are entitled to an earnings allowance since they are not carried by bondholder and stockholder investment. The record shows that Southern Bell accrues a substantial sum of money for federal income, property, gross receipts, and miscellaneous taxes in advance of their due dates, and thereby enjoys the use and benefit thereof in its business. The telephone subscribers contribute this money through their monthly bills. During the year ended December 31, 1957, there was an average monthly balance in the accrued reserve of $4,739,467 for the payment of Federal income taxes, $1,444,716 for the payment of property taxes, and $762,710 for the payment of gross receipts and miscellaneous taxes, or an aggregate monthly balance of $6,946,-893. In addition, the company enjoyed the benefit of certain operating revenues which were subject to advance billing, averaging $3,050,000 each month during the test period. If the tax accruals alone are considered, it is patent that the telephone subscribers have, thus, made an advance contribution of more than 3.7 times the company's total working capital requirements of $1,840,332. As a consequence, if these subscribers were obligated to pay a return on this working capital, it would be tantamount to a return on funds which they have themselves supplied. And it would constitute unjust enrichment to Southern Bell. In Re South Carolina Generating Co. (1956) 16 F.P.C. 52, 15 P.U.R. 3d 289, the Federal Power Commission said:

" 'And, with respect to income tax accruals, we have consistently held that when funds for working capital are supplied by ratepayers and result from the annual lag in income tax payments, the utility has available to it funds which offset capital requirements otherwise to be supplied by investors. To the extent income tax accruals are available from payments by Georgia Power Company, it is inequitable to require it to pay a return upon working capital. Alabama-Tennessee Nat. Gas Co. v. Federal Power Commission, 3 Cir., 1953, 203 F.2d 494, 99 P.U.R., N.S., 141; Northern Nat. Gas Co. v. Federal Power Commission, 8 Cir., 1953, 206 F.2d 690, 1 P.U.R. 3d 310, certiorari denied 1954, 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416.' " [7]

Here again we agree with the Commission which has so aptly stated the answer to the Company's contentions.

### Capital Structure.

As previously pointed out one of the principal disputes between the Company and the Commission relates to the rate base

7. For other cases cited by the Commission see 26 P.U.R.3d at page 80. See also Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, supra.

on which the rate of return should be calculated.

Prior to the decision of the United States Supreme Court in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the Louisiana Public Service Commission followed the original cost less depreciation theory in rate making proceedings because it considered that this theory was mandatory to meet federal due process requirements, although no decision of this Court held it was necessary to meet state requirements of due process. After the decision in the Hope case the Commission concluded that Louisiana was free to adopt the use of the "prudent investment" theory in public utility rate making. Accordingly in the case of Louisiana Public Service Commission v. Louisiana Power & Light Company, 65 P.U.R., N.S., 18, the Commission adopted a new formula under the "prudent investment" theory, based on 6% of the gross plant less 5⅓% on depreciation reserve. It applied that formula in the Louisiana Power & Light Company case and in 29 subsequent cases. When it declined to apply it to the Gulf States Utilities we held that its action was discriminatory and we reversed the Commission and applied the formula ourselves.[8]

Subsequently the formula adopted by the Commission in the Louisiana Power and Light case, supra, was abandoned and the hypothetical debt ratio formula adopted. It was applied to Southern Bell in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, supra, and again in this case.

Southern Bell has bitterly attacked the application of this formula in the determination of its rate base contending that under the evidence it was "tailor made" for application to Southern Bell alone. The Commission in a supplemental brief denies this and points out that it has applied this new formula in four cases, namely: Reserve Telephone Company, Docket No. 7465, Order No. 7476, dated April 11, 1958, 23 P.U.R.3d 307; Breaux Bridge Telephone Co., Docket No. 7521, Order No. 7535, dated June 3, 1958, 25 P.U.R.3d 82; Oak Grove Water Co., Docket No. 7674, Order No. 7692, dated November 19, 1958, 26 P.U.R.3d 549; and United Gas Corporation, Docket No. 7796, Order No. 7827 dated June 23, 1959, and that it has now pending four additional cases namely: United Gas Pipe Line Company, Docket No. 7970; Evangeline Gas Company, Docket No. 8008; Sugar Bowl Gas Company, Docket No. 8065; Northeast Louisiana Telephone Company, Docket No. 8072, in which it intends to apply this same formula.

The Company's application for a raise in rates is based on the net investment theory.

8. Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250.

R. R. Stubbs, Vice-President of Southern Bell, in his testimony said in answer to a question by counsel for the Commission: "We have a debt ratio, but we did not base our rate request on a debt ratio, sir." And the attorney for Southern Bell in answer to an inquiry by the Chairman of the Commission said: "I just didn't want the matter to be confused as to what our application is based on. It has nothing to do with debt ratio."

The Company opposes the application by the Commission of a formula based on a 45% debt ratio and 55% common stock equity in its determination of a fair rate of return when as a matter of fact the debt ratio of Southern Bell averaged only 24.7%, during the test period. According to the record, this debt ratio actually exceeded 45% in 1947 but it has steadily been reduced since that time.

The Company argues that the Commission has invaded the reasonable range of the discretion of the Company's board of directors when it in effect attempts to determine the amount of debt which the utility must incur. This same argument was made when this case was before us in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, supra [232 La. 446, 94 So.2d 435], where we rejected the Company's contention. We pointed out that there is no prescribed formula set by the constitution or the legislature for the fixing of "just and reasonable" rates for public utilities and that the Commission therefore is given wide discretion in adopting any reasonable formula as long as that formula results in rates which will enable a utility to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.[9] Since the decision of the United States Supreme Court in the case of Federal Power Commission v. Hope Natural Gas Co., supra, the hypothetical 45% debt ratio rule has been almost universally adopted in those states where there is no formula prescribed by constitutional provisions or statutes for the determination of a rate base. In addition to the approval of this formula by us it has been held valid by the courts in the states of Massachusetts,[10] New Hampshire,[11] Vermont,[12] Maryland,[13] Mississip-

9. See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.
10. New England Telephone & Telegraph Co. v. Massachusetts Department of Public Utilities, 331 Mass. 604, 121 N.E. 2d 896, 6 P.U.R.3d 65.
11. New England Telephone & Telegraph Co. v. State, 98 N.H. 211, 97 A.2d 213, 99 P.U.R.,N.S., 111.
12. Re New England Telephone & Telegraph Co., 116 Vt. 480, 80 A.2d 671, 90 P.U.R.,N.S., 414.
13. Chesapeake & Potomac Telephone Co. of Baltimore City v. Public Service Commission, 201 Md. 170, 93 A.2d 249, 97 P.U.R.,N.S., 50.

pi,[14] New Mexico,[15] Idaho,[16] and Pennsylvania.[17] It has likewise been adopted by the commissions in the States of Tennessee,[18] Connecticut,[19] South Dakota,[20] Utah,[21] Texas,[22] Nebraska,[23] Illinois,[24] Alabama,[25] and in the District of Columbia.[26] The philosophy of this formula is based on the proposition that there is a great savings in income taxes through the deduction of interest from earnings where there is a substantial debt ratio and that it is the duty of the utility to pass this savings on to the subscribers. As pointed out in New England Telephone & Telegraph Co. v. Massachusetts Department of Public Utilities, 331 Mass. 604, 121 N.E.2d 896, 904, 6 P.U.R.3d 65, "* * * debt structure and the percentages of debt and equity capital enter vitally into the determination of the amount which the consuming public should pay. A 35% debt ratio might be deemed in the nature of a company luxury not to be reflected in rates to be charged the public." Citing our own decision in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission supra, the Connecticut Public Utilities Commission in support of the 45% debt ratio formula says:

"In common with other operating companies of the Bell System, the Southern New England Telephone Company has consistently attempted to maintain a low debt ratio. It is manifest that the realities of the federal corporation tax structure make such a low ratio an expensive luxury, which must be borne by the ratepayers. This is so because interest on debt securities is tax deductible, but dividends on stock are not so deductible. Consequently a lower debt ratio requires higher revenues for servicing of the stock of the company. This commission recognizes the fact that debt financing requires less revenues from ratepayers than equity financing and concludes that ratepayers should not be penalized by management's decision to maintain an unduly low debt ratio." [27]

14. Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, supra.

15. State Corporation Commission v. Mountain States Telephone & Telegraph Co., 58 N.M. 260, 270 P.2d 685, 4 P.U.R.3d 33.

16. Petition of Mountain States Telephone & Telegraph Co., 76 Idaho 474, 284 P.2d 681, 8 P.U.R.3d 265.

17. Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission, 186 Pa.Super. 1, 140 A.2d 114, 24 P.U.R. 3d 9.

18. Re Southern Bell Teleph. & Teleg. Co., 100 P.U.R.,N.S., 33.

19. Re Southern New England Telephone Company, 20 P.U.R.3d 34.

20. Northwestern Bell Telephone Company, 20 P.U.R.3d 385.

21. Re Mountain States Telephone & Telegraph Company, 2 P.U.R.3d 75.

22. Re Southwestern Bell Telephone Company, 2 P.U.R.3d 265.

23. Re Northwestern Bell Telephone Company, 97 P.U.R.,N.S., 394.

24. Re Illinois Bell Telephone Company, 7 P.U.R.3d 493.

25. Re Southern Bell Telephone and Telegraph Co., 4 P.U.R.3d 195.

26. Chesapeake & Potomac Telephone Co., 6 P.U.R.3d 222.

27. Re Southern New England Telephone Company, supra.

■ We see no reason at this time to depart from our decision in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, supra, in which we held that it was within the discretion of the Commission to adopt this formula. It is the end result, not the method employed, that is controlling.

### Cost of Debt Capital.

Southern Bell's long term debt comprises debenture bonds bearing various rates of interest. The latest issue (as shown by this record) in the amount of $70,000,000 was sold to the public in June, 1957 at an interest cost of 4.93%. Notwithstanding this the Commission for purposes of this proceeding adopted a range of 4% to 4.1% as the current cost of debt capital which it applied to the incremental debt capital necessary to raise the Company's debt ratio to the level of 45%. In contending that the rate of interest should be 5%, Southern Bell in its brief complains:

"This unrealistic rate of interest of 4% is immediately applied by the Commission to $37 million of fictitious long term debt which would require a period of years to actually raise but which the Commission arbitrarily substituted for some of the Company's present capital stock."

■ While the Commission may be theoretically right in that Southern Bell, according to the formula, should have always maintained a debt ratio of 45%, and ways maintained a debt ratio of 45%, and should have sold its bonds while interest rates were lower, we agree with the Company that this is unrealistic, in that Southern Bell must raise this additional money at current and future cost, in order to meet the new formula and in order that it may carry out the vast expansion program so necessary in this state. Even the Commission's expert witness Hirsch used 5% and 5.1% in certain instances in setting up hypothetical debt ratios. We believe this complaint is well founded, and that on the record before us the cost of debt capital should be fixed at 5%. Indeed, when the Commission reconsiders the matter, it may well find that intervening experience justifies an even higher rate of interest than 5%.

### Rate of Return.

In determining its rate of return the Commission, in its analysis of the earnings under the telephone rates in effect during the test year, concluded that based on the actual debt ratio of 24.7%, the earnings-price ratio realized based on $100 per share of common stock paid was 4.79%. It concluded that under its hypothetical assumption of a 45% debt ratio, the earnings-price ratio realized based on $100 per share paid, amounted under the existing rates to 5.94%. The Commission likewise made calculations based on a supposed capital structure with a 50% debt and 50% common stock ratio, and with a 50% debt, 12% preferred stock and 38% common stock ratio. Since the Commission adopted the 45% debt ratio

and 55% common stock ratio as its formula, it is not necessary to consider its other calculations. The Commission concluded that the earnings-price ratio required to adequately compensate common stockhold- ers [28] based on a 55% common stock ratio was 6.75%. The detailed analysis by the Commission based on the actual debt ratio of 24.7% and on the assumed debt ratio of 45% is as follows:

|  | Debt Ratio 24.7% (1) | Debt Ratio 45% (2) |
|---|---|---|
| Average Capitalization: |  |  |
| Long-Term Debt | $ 45,129,300 | $ 82,179,000 |
| Preferred Stock | — | — |
| Common Stock | 129,973,670 | 92,923,990 |
| Earned Surplus | 7,521,000 | 7,521,000 |
| Capital and Surplus | $182,623,990 | $182,623,990 |
| Actual Net Operating Income | $ 7,796,227 | $ 7,796,227 |
| Federal Tax Saving Resulting from Prudent Debt Ratio (Credit) | — | 770,633 |
| Adjusted Net Operating Income | $ 7,796,227 | $ 8,566,860 |
| Total Long-Term Debt Interest | $ 1,511,834 | $ 2,993,823 |
| Interest on Advances from A. T. & T. | 55,132 | 55.132 |
| Preferred Stock Dividends | — | — |
| Earnings Available for Common Stock | $ 6,229,261 | $ 5,517,905 |
| Earnings-price ratio Realized based on $100 per share paid | 4.79% | 5.94% |
| Earnings-price ratio Required to Adequately Compensate Common Stockholders (A. T. & T.) |  | 6.75% |
| Common Stock Earnings Required to Adequately Compensate Stockholders (A. T. & T.) |  | 6,272,370 |
| (Deficiency) in, or Excess, Common Stock Earnings |  | $ (754,465) |
| (Deficiency) in, or Excess, Gross Operating Revenues * |  | $(1,680,000) |

(* Based on factor of 0.4498982 as computed by company) [29]

**28.** All of the common stock of Southern Bell is owned by American Telephone and Telegraph Company.

**29.** This represents the percentage of gross revenue which constitutes net revenue.

This deficiency amounting to $1,680,000 was increased to $1,918,707 by certain additional credits and debits set up by the Commission as follows:

|  | Debt Ratio 45% (1) |
|---|---|
| (Deficiency) in, or Excess, Gross Operating Revenues, *Before* Normalizing Adjustments *supra* | $(1,680,000) |
| Credit for Abnormal and Nonrecurring Advertising Expenses | 225,000 |
| Credit for Increase in Directory Advertising Rates | 86,000 |
| Adjusted (Deficiency) in, or Excess Gross Operating Revenues, *Excluding* General Wage Increase Eff. 5/18/58 | $(1,369,000) |
| General Wage Increase Effective May 18, 1958 * | (549,707) |
| Adjusted (Deficiency) in, or Excess, Gross Operating Revenues, *Including* General Wage Increase Eff. 5/18/58 | $(1,918,707) |

(* Per Groce Exhibit 8)

———◆———

Before we discuss the reasonableness of the earnings-price ratio of 6.75% which the Commission proposes to apply to a hypothetical common stock ratio of 55%, we shall first dispose of certain other problems resulting from the foregoing computations.

### Abnormal and Non-Recurring Advertising Expenses.

The Company complains because the Commission refused to take into account an expenditure of $225,000 [30] during the test year for advertising purposes including newspaper, radio, and television, ostensibly as a means of informing the public as to the Company's situation in connection with the instant application for a rate increase.

After reviewing the rulings of the courts and utility companies of other states which condemn the practice of utilities in using the ratepayer's money to conduct an advertising campaign to increase the rates proposed to be charged to the ratepayer, the Commission disallowed this item not on the grounds of impropriety but because as the Commission stated:

"It is sufficient for our purpose that the record clearly shows these expenditures to be abnormal and nonrecurring in character and that their inclusion in the operating

---

30. It will be noted that the Commission deducted this in the table last above quoted.

expense accounts would distort the test-year earnings."

■■ We believe that the Commission was correct in its ruling, although it should make proper allowance for ordinary advertising expenses.

Refusal to Deduct Income Tax Payment.

■ The Company complains of the addition in the previously quoted table of the sum of $770,633 to the actual net operating income, contending that since this amount was actually paid in income taxes it is entitled to this deduction. Whether this item should be considered or not depends of course on whether the 45% debt ratio formula is accepted as reasonable. Since this $770,633 represents federal taxes that will be saved should the Company convert its debt ratio from 24.7% to 45%, the Commission was correct in refusing to deduct it from the actual net operating income in the application of its formula. Furthermore, if a 5% cost of debt capital is adopted instead of a 4% cost, the Commission would be justified in increasing the amount of the income tax saving to the subscribers, which according to the record amounts to 52% of the amount of interest paid.

However, the Company should be given a reasonable time to adjust its debt ratio to the new formula, should it so desire. Two of the expert witnesses testified that a period of approximately five years will be required to accomplish this end. Not only must $37,000,000 be raised immediately for this purpose, but other millions both in debt capital and equity capital must be raised for expansion. The Commission has in effect made its new formula retroactive. We do not believe this is just and reasonable.

## Surplus.

Southern Bell complains that the Commission erred in declining to allow it a return on the earned surplus which amounts to $7,521,000. All of the common stock of Southern Bell is owned by American Telephone and Telegraph Company, hereinafter referred to as "American". None of it is sold on the market. American purchased this stock at par value and paid nothing additional for surplus. This surplus was actually contributed by the subscribers.

■ Reasonable rates always include a sufficient amount for surplus. "Ability to attract capital and maintain credit so as to obtain additional funds on a reasonable basis is fortified by the ability to earn more than the bare cost of capital. A successful and healthy business, attractive to investors, must have an over-all return sufficient to cover its actual disbursements for interest and dividends and something in addition to give it stability under changing economic conditions. The return should be sufficient not only to pay debt charges and a reason-

able dividend on stock but it should also provide a reasonable amount for surplus." [31]

██ However, while the utility is entitled to earn a sufficient amount to acquire surplus, that is not to say that it is entitled to earn a return on this surplus. After all the surplus is paid by the subscribers and they should not be required to pay a return on the amount which they have contributed to maintain the stability of the Company.

██ The Company's expert witness, Badger, testified that the growth factor is one of the important elements considered by investors. This compound growth resulting from the accumulation of surplus on which compound returns are paid undoubtedly is attractive to investors. But it is not just to the subscribers. It is one thing to say that subscribers must contribute a reasonable amount to surplus to protect the Company in case of hard times or to provide for an emergency, but it is quite another thing to say that the subscribers must contribute a surplus to be used for growth and expansion, and then pay a return on the money or new plant which they themselves have contributed. Capital for growth and expansion should be furnished by the investors, not by the rate payers. It is not sufficient answer to say that this will encourage the utility to withdraw all surplus in the form of dividends and then reinvest the amount of sur-plus withdrawn in common stock. Should the Company by the adoption of a 100% pay-out ratio dissipate the surplus which the subscribers contribute for stability and protection against emergency, the Commission, under the prudent investment theory, can take this into account in fixing rates and disallow entirely, if necessary, a contribution by the subscribers to surplus.

We shall discuss later whether the earnings-price ratio of 6.75% is reasonable.

### Wage Increase.

In its specification of errors Southern Bell complains of the alleged failure of the Commission to take into account an increased wage expense of $549,707. Southern Bell is in error in this contention. Reference to the table last hereinabove quoted will show that this item was taken into account.

### Reproduction Costs.

██ In the specification of errors Southern Bell contends that the Commission erred in excluding the testimony and exhibits relating to present day reproduction cost less depreciation. Louisiana has never adopted the reproduction cost new less depreciation theory of rate making. Estimates of reproduction cost new less depreciation are too conjectural to have

31. Ruling Principles of Utility Regulation Rate of Return, by Nichols, Page 199.

probative value. Similar evidence was rejected for this reason by the Federal Power Commission in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206, and in the Hope case, supra. Since the Commission has adopted a new formula based on the prudent investment theory, we see no error in excluding evidence relative to another formula which has never been adopted in Louisiana.

### Disallowance of Increase.

Southern Bell's complaint with respect to the disallowance by the Commission of the increase in income in the sum of $1,918,707 has already been disposed of favorably to Southern Bell by the District Court.

### Earnings-Price Ratio.

Southern Bell complains that the Commission erred in taking an earnings-price ratio which it obtained by dividing earnings by the *market price* of certain utility stocks and then applying this earnings-price ratio to the *par value* of the common stock of Southern Bell and at that only to that portion of the common stock which represents the hypothetical 55% of the capitalization.

In fixing the earnings-price ratio used in this case the Commission made a summary of average earnings-price ratios of various utilities whose stock was sold on the market covering the years 1954–1957, both inclusive. The Commission in its opinion made the following summary of average earnings-price ratios:

|  | 1954 | 1955 | 1956 | 1957 | 4-Year Average |
|---|---|---|---|---|---|
| Moody's 24 Electric Utilities | 6.48% | 6.11% | 6.34% | 6.80% | 6.43% |
| Dow-Jones 15 Utilities | 6.35 | 6.20 | 6.67 | 6.80 | 6.51 |
| 10 Leading Elec. Util. in U. S. | 6.67 | 6.18 | 6.67 | 7.00 | 6.63 |
| 3 Largest Elec. Util. in U. S. | 6.41 | 6.13 | 6.71 | 7.13 | 6.60 |
| Duke Power Company | 6.85 | 6.13 | 6.12 | 6.82 | 6.48 |
| Louisiana Electric Utilities | 6.35 | 5.77 | 5.82 | 5.90 | 5.96 |
| 5 Bell System Oper. Companies | 6.17 | 5.84 | 6.23 | 6.75 | 6.25 |

After analyzing these, the Commission adopted an earnings-price ratio of *6.75%* which it applied to the *par* value of the hypothetical 55% of common stock capital of Southern Bell.

The fallacy of using an earnings-price ratio based on the relationship of current earnings and current market prices is pointed out by the Company's expert witness Langum. As earnings go up or down, the market price of the stock correspondingly goes up or down, so that the earnings-price ratio remains the same. One utility may be earning an excessive rate of return and

another a rate of return so low as to be confiscatory, yet the earnings-price ratio would be approximately the same because of the consequent high market price of the stock of the former and the consequent low market price of the stock of the latter.

Langum produced numerous exhibits, which it is not necessary to detail here, illustrating the absurd results that would follow the application of the earnings-price ratio used here to various utilities. Indeed, one of the experts, in applying this formula to all of the large utilities in the United States, was able to show that the market price of their stocks would be so depressed as to amount to a national calamity. Langum concludes: "that earnings-price ratios do not provide any determination of the proper level of earnings per share or earnings per dollar of equity capital as stated on the books. This is particularly true when market price is far above book value. About all earnings-price or price-earnings ratios provide is a measure of how high the market is for a particular stock, both in comparison with previous periods for the same stock, and in terms of averages of how high the stock market is in the overall.

They are not an adequate guide to the level of earnings."

The Commission's expert Hirsch stoutly defends the use of the earnings-price ratio in this case. This witness, however, was shown to have given contradictory testimony in other cases. The same is true of the Company's expert witness Badger. After reviewing the record, we conclude that we cannot place too much reliance on the opinions of these two witnesses.

■ Be that as it may, we are of the view that it is not necessary in this case to determine whether the earnings-price ratio formula used by the Commission is sound or not. Here again we point out that it is the end result, not the method used, that counts.[32] And the end result, we conclude is grossly discriminatory.

### Discrimination.

Southern Bell complains that the rates fixed by the Commission are discriminatory and that the end result of the Commission's allowance of a return of 6.75% on 55% of the hypothetical capital structure, under the formula adopted by the Commission, is such that Southern Bell will not be able

32. In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 287, 288, 88 L.Ed. 333, 345, 346 it was said:

"＊ ＊ ＊ Under the statutory standard of 'just and reasonable.' it is the result reached, not the method employed, which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180 (1191, 1192, 1197); West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761 (768); West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 692, 693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (1657, 1658) (dissenting opinion). It is not theory but the impact of the rate order which counts."

to compete successfully with other utilities having corresponding risks, for capital in the money markets.

Southern Bell is a New York corporation doing business in nine southern states, namely: Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee. As heretofore stated all of its stock is owned by American.

The evidence shows that in the eight states, other than Louisiana, Southern Bell was earning in 1957, 6.45% on its property rate base, as compared to 4.07% in Louisiana and 4.46% in Louisiana with the increase granted by the District Court.[33]

Southern Bell in its brief in emphasizing the disparity between the earnings of Southern Bell (intrastate in Louisiana) and other utilities in Louisiana and elsewhere has quoted from the exhibits and the testimony offered in support thereof the following figures:

|  | Rate of Return on property Rate Base |
|---|---|
| *All large electric utilities in the United States | 6.1% |
| *All large electric utilities in the South | 6.4% |
| * Seven large subsidiary companies in the South | 6.3% |
| * Manufacturers | 10.1% |

| | |
|---|---|
| * Stable income companies | 10.9% |
| ** Telephone industry as a whole | 6½% |
| ** Bell System as a whole | 6½% |
| ** General Telephone Corporation | 7¼% |
| ** Non-Bell telephone companies as a whole | 7% |
| ** Southern Bell as a whole | 6% |
| Southern Bell-first six months 1957, excluding Louisiana | 6.4% |

* Five year average
** 1956

| | |
|---|---|
| Major electric companies, Alabama, 1957 | 6.4% |
| Major electric companies, Florida, 1957 | 6.89% |
| Major electric companies, Georgia, 1957 | 6.25% |
| Major electric companies, Kentucky, 1957 | 5.81% |
| Major electric companies, Louisiana, 1957 | 6.14% |
| Major electric companies, Mississippi, 1957 | 6.35% |
| Major electric companies, North and South Carolina, 1957 | 6.30% |
| Average all companies | 6.29% |

| | |
|---|---|
| U. S. electric utilities, 1956 | 6.2% |
| U. S. Natural Gas pipe line utilities, 1956 | 7.1% |
| U. S. telephone utilities, 1956 | 6.5% |
| Eleven electric utility holding companies, 1956 | 6.55% |

33. These figures should be revised slightly upward because of the revision which we have made in the net investment and the allowable expenditures.

Eighteen retail gas distribution
utilities, 1956    7.59%

Southern Bell earnings in other states, 1957

Alabama    6 87%
Florida    6.86%
Georgia    6.32%
Kentucky    5.92%
Mississippi    6.19%
North Carolina    6.86%
South Carolina    6.34%
Tennessee    5.56%

Southern Bell 1957    6.45%

IN CONTRAST:

Southern Bell in La. (intrastate)
1957    4.07%
Southern Bell in La. (Intrastate
with increase allowed)    4.46%

Since the Commission has adopted a new prudent investment formula, the following comparison is even more significant:

| | Return on Equity |
|---|---|
| **Witness Stubbs:** | |
| Large U. S. electrics—five year average | 10.5% |
| Sixteen large electrics—five year average | 11.4% |
| Seven large subsidiary electrics in South—five year average | 11.9% |
| Four Louisiana electrics—five year average | 13.7% |
| U. S. Manufacturers— | 11.2% |

Twenty stable income
companies—    12.2%

Witness Burke:

Major electric companies in Southern Bell territory in 1957:

Alabama    12.02%
Florida    13.32%
Georgia    13.31%
Kentucky    9.30%
Louisiana    12.21%
Mississippi    12.48%
North and South Carolina    10.75%
Average    11.73%

Witness Badger:

Six Year average 1951–1956:

Standard & Poor's 20 utility stocks    11.01%
Moody's 24 utilities    11.14%
Dow-Jones' 15 utilities    10.85%
Louisiana utility companies    12.41%
Large electric utilities    10.19%

Witness Langum:

Electric utilities in
U. S., 1956    10.8%
Natural Gas pipe line
utilities, 1956    13.7%
Telephone utilities
in U. S., 1956    8.5%

Witness Nolan:

Southern Bell Louisiana Intrastate    4.72%
Southern Bell Louisiana Intrastate
after increase    5.08%

The correctness of these computations is not disputed by the Commission. It is the

Commission's position that Southern Bell is not similar to these other utilities, notwithstanding its inconsistency in taking its earnings-price ratio from most of them.

It is obvious that there is a great disparity between the return received by Southern Bell on its property rate base as well as on its equity capital and the return received on property rate base and equity capital by other utilities in Louisiana, in the nine southern states in which Southern Bell operates, and in the United States.

While it may be that no formula can be laid down which will apply uniformly in all cases or to all kinds of utilities yet in fixing a rate of return consideration must be given to the rate of return allowed other utilities similarly situated. In Federal Power Commission v. Hope Natural Gas Co., supra [320 U.S. 591, 64 S.Ct. 288], the United States Supreme Court said:

"From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345-346, 12 S. Ct. 400, 36 L.Ed. 176. *By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks.* That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit *and to attract capital.*" (Italics ours.)

In Gulf States Utilities Co. v. Louisiana Public Service Commission, supra, where it was shown that the Commission in thirty cases allowed a return of 6% on investment as a just and equitable rate of return, we held that its refusal to allow a similar rate of return to other utilities engaged in the same calling would be inequitable and unjust in the absence of exceptional circumstances and that such action would be discriminatory.

In the instant case it is established by the evidence that no utility is receiving anywhere near as low a return as Southern Bell. The disparity is so great that we must of necessity hold that the action of the Commission in its end result is discriminatory and that the rates fixed are not just and reasonable under the circumstances.

The record shows that there is great necessity for an immediate expansion program in Louisiana. Realtors, developers, contractors, manufacturers, farmers and business men of every character have testified to the necessity of an immediate heavy construction program for additional telephone service. Business in the state, according to the testimony, is being severely handicapped because it is impossible to get

the necessary service. Occupants of homes are likewise being seriously inconvenienced.[34] It is imperative, according to the record, that Southern Bell immediately expend $49,000,000 on a program of expansion necessary to meet the public demands. An annual expenditure thereafter of $46,000,000 per year is required. This construction will necessarily be at inflated prices as compared to previous construction costs.

It must not be overlooked, according to the testimony of Southern Bell's Vice President, that heavy construction at high cost levels reduces the earning rate through increasing expenses and investment without corresponding increases in the revenues. For illustration, he pointed out, during the period from 1952 to 1957 the rate of return was reduced from 6.18% to 4.24%. As there is nothing to indicate that the inflationary spiral is coming to an end, similar conditions may be expected in the future, when the expansion program will be undertaken. According to the testimony of this witness, the addition of plant at cost in excess of the average cost of existing plant depresses the earnings rate because it tends to increase both the expense per telephone and the investment per telephone without a corresponding increase in the revenue per telephone.

The large amount of capital necessary to meet the expansion needs of Louisiana, as well as the amount necessary to revise the capital structure to meet the demands of the Commission's formula, must be raised in the money markets in competition with other utilities whose stock and bonds are more attractive to investors because of their greater returns. While we are dealing here with intrastate rates only, we cannot build a wall around Louisiana and say this capital must be raised in Louisiana alone. Even if we adopted such a provincial attitude, there would be no way of

34. In a brief filed by Communications Workers of America, AFL–CIO, as amicus curiae, it is said: "Of equal importance to CWA members in Louisiana was a figure showing the earnings of Southern Bell in the other eight states in which it operates. Southern Bell's earnings in the other eight states, or its earnings excluding Louisiana, was 6.4% for the first half of 1957. We believe it is only natural to expect the Company to invest more money for expansion and thereby give more work and create more jobs in the other states where it can earn so much more on its investment. The Union does not believe that this Court should approve a rate which may have the effect of depriving many citizens of the State of job opportunities and job security.

"As shown at the hearings, there is a great demand for telephone service in Louisiana. The Company estimated it would have to spend more than $46,000,000 a year on new construction to meet this demand. The members of CWA, as Citizens, want to see this state get the telephone service it needs in addition to the increased work and job opportunities which would result. If reasonable rates are approved, the Company should be able to raise and invest the money to meet this need for telephone service, and all the people will benefit therefrom."

preventing utilities located in other states from competing with Southern Bell in Louisiana for Louisiana capital. The answer is there must be no discrimination.

The ascertainment of a fair return in a given case is a matter incapable of exact mathematical demonstration. It is one of reasonable approximation having its basis in a proper consideration of all relevant facts.[35] The Commission concluded that an earnings-price ratio of 6.75% should be allowed on equity capital computed according to its formula. The Commission's expert Hirsch fixed the rate at between 7.20% and 7.25%. The Company has asked for not less than 6% on its property rate base, which the Commission finds is equivalent to 9.11% on equity capital, computed on its hypothetical 55% formula. The average earnings on equity capital by telephone utilities in the United States is 8.5%.

In the Hope case, the source of the prudent investment theory of rate making, the Federal Power Commission allowed a 6½% return on the "actual legitimate cost" of the Company's interstate property, less depreciation and depletion, plus allowances for unoperated acreage, working capital and future net capital and additions. This was reversed by the United States Circuit Court of Appeals of the 4th Circuit, 134 F.2d 287, which in turn was reversed by the Supreme Court of the United States, thus reinstating the Commission's ruling allowing a 6½% return on the net investment.

A similar allowance of a 6½% return on a rate base arrived at by taking the actual legitimate cost of the property, less accrued depreciation and depletion, plus working capital and gross plant additions, was approved by the United States Supreme Court in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.

In those states which have adopted a hypothetical debt ratio formula similar to or substantially similar to the one adopted by the Commission in this case, consideration has been given not only to the return on the hypothetical amount of common stock but also to the end result or overall rate of return on the net investment. Thus in Massachusetts the return allowed on the 55% of common stock was 8.5% and the return on all capital invested, 6.23%.[36] In Pennsylvania, where the hypothetical debt ratio was 55%, the return on common stock was estimated at 9.50% and an overall rate of return based on the composite cost of all

35. Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943, 54 P.U.R.,N.S., 1; Willcox v. Consolidated Gas Co., 1909, 212 U.S. 19, 29 S. Ct. 192, 53 L.Ed. 382; United Railways & Electric Co. of Baltimore v. West, 1930, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390.

36. New England Telephone & Telegraph Co. v. Massachusetts Department of Public Utilities, supra.

capital was fixed at 5.80%.[37] In New Mexico a rate of return of 6.95% on original cost was allowed.[38] In New Hampshire a return of 5.75% on original cost was approved where it was shown that the cost of debt capital was 3.56% and the cost of equity capital between 7.41% and 7.84%.[39] In Maryland a rate of 5.96% on a rate base slightly in excess of original cost was approved.[40] In Idaho a rate of 5.71% on the intrastate investment was approved.[41]

While we are not prepared to hold and do not hold that an earnings-price ratio of 6.75% on equity capital under a formula of 45% debt and 55% common stock ratio is in itself not just and reasonable when applied alike to all utilities similarly situated, we do hold that an earnings-price ratio of 6.75% on a hypothetical 55% of common stock capital as applied to one utility, while others similarly situated are earning 8.5% on equity capital and not less than 6% on

property rate base, is discriminatory and for that reason is not just and reasonable. We believe that a return of not less than 6% on the property rate base as we have revised it is necessary to avoid discrimination. We realize that in the application of its formula the Commission may prefer to fix a rate of return on the hypothetical 55% of common stock, rather than a return on the property rate base, and thus in due time give the subscribers the benefit of the income tax saving resulting from an increased debt ratio. However, in applying its new formula, the Commission at the present time must so adjust the rates that the end result will be a return of not less than 6% on the property rate base as revised by us.

To summarize we find:

1. The cost of debt capital should be fixed at 5% and not 4%, unless intervening experience justifies a cost in excess of 5%.

37. Riverton Consolidated Water Co. v. Pennsylvania Public Utilitiy Commission, supra.
38. State Corporation Commission v. Mountain States Telephone & Telegraph Co., supra.
39. New England Telephone & Telegraph Co. v. State, supra.
40. Chesapeake and Potomac Tel. Co. of Baltimore City v. Public Service Commission, supra.
41. Petition of Mountain States Telephone & Telegraph Co., supra.
   In Mississippi the court said: "The Commission found that with a prudent capital structure as indicated above and a rate base of $60,568,045, the net income of the Company, under the rates in effect during the test period, would be sufficient to pay the interest on debt capital and to compensate the owner of the common stock on the basis of an earnings-price ratio of 6.30 per cent or 6.40 per cent, which would be commensurate with the earnings currently realized by investors in reasonably comparable enterprises. We think there is ample evidence in the record to support the Commission's finding on that point." [113 So. 2d 656.] The court held that a resulting overall return of 4.96% on the rate base was not confiscatory. Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, supra.

2. A reasonable allowance should be made for the normal annual cost of advertising.

3. The earnings-price ratio to be applied to the hypothetical 55% of capital represented by common stock, should be so adjusted that the end result will be a return of not less than 6% on the property rate base as revised by us.

4. The district court was correct in ordering the increase of $1,918,707 in revenue put into effect at once.

5. In all other respects the Commission was correct in its findings.

For the reasons assigned, it is ordered that the judgment of the district court insofar as it directs the Louisiana Public Service Commission to take appropriate measures to authorize such increases in the rates and charges of Southern Bell Telephone and Telegraph Company, as will produce additional gross revenues of $1,-918,707 from its intrastate operations in the State of Louisiana and insofar as it orders Southern Bell Telephone and Telegraph Company to pay all costs of these proceedings be affirmed.

It Is Further Ordered that the said judgment be otherwise reversed and set aside, that the Order Number 7640 of the Louisiana Public Service Commission dated October 10, 1958, in proceeding No. 7432 of its docket entitled ex parte Southern Bell Telephone & Telegraph Company, be annulled and set aside, that this cause be remanded to the Louisiana Public Service Commission for further proceedings according to law and the views herein expressed, and that the Louisiana Public Service Commission be directed to take appropriate measures to authorize such additional increases in the rates and charges of Southern Bell Telephone and Telegraph Company as will produce such additional gross revenues from its intrastate operations in the State of Louisiana as will be necessary to meet the views herein expressed.

SIMON, J., concurs in the reasoning and decree of the majority. However under the facts presented I am convinced that the minimum rate returned of 6.25% would be more just and reasonable.

HAMITER, J., concurs in part and dissents in part being of the opinion that the judgment appealed from should be affirmed.

HAMLIN, J., concurs with written reasons, being convinced that the rate of return should be not less than 6.25%.

HAMLIN, Justice (concurring).

In the majority opinion it is stated, and I believe correctly, that, while it may be that no formula can be laid down which will apply uniformly in all cases or to all kinds of utilities, yet, in fixing a rate of

return consideration must be given to the rate of return allowed *other utilities similarly situated.*

In Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431, we held that it is the result reached, not the method employed, which is controlling. It is not the theory, but the *impact* of the rate order which counts.

In Vicksburg, S. & P. Ry. Co. v. Railroad Commission, 132 La. 193, 61 So. 199, citing authorities, we held, in substance, that it is not only the right, but the duty of this Court to determine whether the order complained of was justified by the facts of the case; and, that this Court is bound to interfere when it finds that the judgment appealed from is clearly wrong on the evidence.

In Texas & New Orleans R. Co. v. Louisiana Public Service Commission, 235 La. 973, 106 So.2d 438, 442, decided November 10, 1958, we said:

"While it is true that the orders of the Commission are entitled to great weight and the burden is on the railroad to show the invalidity of the orders of the Commission, if the findings and conclusions of the Commission *do not conform to the law and are not supported by the evidence, so that the order of the Commission is unreasonable,* the court may reverse or vacate the order." (Emphasis added.)

In the instant case, the only witness for the Commission was Arnold H. Hirsch.

For the purpose of brevity and to simply set forth my thoughts in the matter, I call attention to the gist of the evidence adduced by the Company regarding the rate of return on property rate base as regards other telephone companies—utilities similarly situated.

| | Rate of Return % |
|---|---|
| R. R. Stubbs and Dr. John Langum | 7.50 |
| Alfred Burke | 6.80 |
| Dr. Ralph Badger | 6.50 (to 7.50) |
| | 3/ 20.80 |
| Mesne average of above | 6.93 |

Dr. Badger also testified that other Bell Telephone Companies in the Bell System were earning up to 7.7%, while the lowest companies in the system earned 6% or better.

The testimony of Mr. Stubbs is to the effect that the rate of return on property rate base is 6½% (6.50) *for the telephone industry as a whole and the Bell System as a whole.*

Raymond A. Nolan testified as to the rate of return to Southern Bell in eight southern states as follows:

| | % |
|---|---|
| Alabama | 6.87 |
| Florida | 6.86 |
| Georgia | 6.32 |

Kentucky --------------------------- 5.92

Mississippi ------------------------- 6.19

North Carolina --------------------- 6.86

South Carolina --------------------- 6.34

Tennessee ------------------------- 5.56

                                    50.92

                            8/  50.92

Mesne average of foregoing -------- 6.36

Since the testimony of Mr. Nolan was adduced, the Supreme Court of Mississippi, in the case of Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 113 So.2d 622, has reduced the rate of return in Mississippi to the range of 4.96% to 5.08%. Accepting the former figure and reducing 6.19% to 4.96%, would reduce the foregoing mesne average from 6.36% to 6.21%.

Considering the testimony of Mr. Stubbs (6.50% for the telephone industry as a whole and the Bell System as a whole), the testimony of Mr. Nolan, and the above mesne averages of 6.21% and 6.36%, it would appear to me that in the instant case a rate of return of not less than 6.25%[1] on property rate base would be fair and reasonable at this time, to allow for the great necessity for an immediate expansion program in Louisiana, the reasons for which being set forth in the original opinion.

Inasmuch as the ascertainment of a fair return in a given case is a matter incap-able of exact mathematical demonstration and is one of reasonable approximation, having its basis in a proper consideration of all relevant facts, I believe that a return of not less than 6.25% will strike the happy medium and will not be unreasonable, whether considered from the viewpoint of the subscriber, the investor, or the Company.

I am in full accord with the reasoning of the Court and the decree rendered herein, subject, however, to my views that the rate, as fixed in the decree, should be "not less than 6.25%."

On Motion for Rehearing.

Rehearing denied.

HAMITER, J., is of the opinion that a rehearing should be granted.

HAWTHORNE, Justice (dissenting).

I am of the opinion that a rehearing should be granted for further consideration of this court's holding that a return of not less than 6 per cent on the property rate base is necessary to avoid discrimination.

As I view the matter, the Constitution of this state (Article 6, Section 4) vests in the Commission the power to fix reasonable and just rates, and of course if the rates fixed are just and reasonable, they will not be confiscatory. The Constitution does not

---

1. It appears that in five of the above enumerated states the return is above 6.25%.

require that every public utility be allowed the same rate of return, and therefore I do not think the court should say to the Commission: "You fix the rates under a mathematical formula to return not less than 6 per cent on the property rate base." The court should not, in my opinion, fix any uniform rate, but should concern itself with determining whether the rates fixed by the Commission are just and reasonable, for under the facts and circumstances in one utility company case a return of more than 6 per cent would be just and reasonable, while in others a return of less than 6 per cent would be just and reasonable. Furthermore, I do not think it proper to say that because the Commission has in the past allowed a return of not less than 6 per cent to other utilities, then it should not at the present time, or even in the future, allow a return of less than 6 per cent. Economic conditions change from time to time, and what was a reasonable and just return in the past may not be just and reasonable now or in the future. Under the facts in the instant case Southern Bell may well be entitled to have the rates fixed so as to return more than 6 per cent in order for the rates to be just and reasonable, or the ruling of the Commission fixing rates so as to return 4.46 per cent may be just and reasonable. On this I express no view.

I think also that a rehearing should be granted so that this court may give further consideration to its existing jurisprudence.

In Gulf States Utilities Co. v. Louisiana Pub.Serv.Comm., 1952, 222 La. 132, 62 So. 2d 250, 253, the Louisiana Public Service Commission allowed Gulf States Utilities Company a rate of return of only 4.35 per cent although the Commission's records showed that for a period of six years, and in 29 cases in which it had fixed rates, it had allowed a return of 6 per cent in matters of that sort. In approving the rate increase there sought by the utility company this court said: " * * * if 6% is and has been considered by the Commission to be a just and equitable rate of return, it would seem that refusal to grant an applicant a rate increase which would enable it to earn 6% would be inequitable and unjust in the absence of exceptional circumstances."

In Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Comm., 1957, 232 La. 446, 94 So.2d 431, 436, decided after the decision in the Gulf States case, the Commission denied to Southern Bell an increase in rates which the telephone company said was needed to provide it with a 6 per cent return. In effect, what the Commission did there was to order the telephone company to reduce its rates to a level at which a 6 per cent return could not be realized. The district court set aside the ruling of the Commission ordering the reduction of the rates, being of the view that the opinion of this court in the Gulf States case necessitated

this action. On appeal, however, this court reinstated the order of the Commission reducing the telephone company's rates so that there was a return of less than 6 per cent, saying: "There is no constitutional requirement that every regulated company be allowed the same rate of return."

In the instant case this court seemingly has returned to its holding in the Gulf States case, as it cited that case in support of its holding here.

Thus it will be seen that the decision in Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Comm. (1957), supra, overruled the Gulf States case without saying so, whereas the present decision has the effect of overruling this court's decision in the 1957 Southern Bell case and of reinstating the holding in the Gulf States case.

The district judge in rendering his decision in the 1957 telephone company case followed the decision of this court in the Gulf States case and was reversed; in the instant case the same district judge followed the decision of this court in the first telephone company case, only to be reversed again. Thus it is apparent that our recent decisions in these utility company cases are very confusing and leave the Commission, the utility companies, and the district courts of this state in hopeless doubt about this fundamental problem of ratemaking.